In the
# United States Court of Appeals
## for the Fourth Circuit

**TIMOTHY CAPPS,**

*Plaintiff – Appellant,*

v.

**NEWMARK SOUTHERN REGION, LLC;
NEWMARK & COMPANY REAL ESTATE, INC.,**

*Defendants – Appellees,*

and

**DOES 1-25,**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

---

**BRIEF OF APPELLANT**

---

Matthew Nis Leerberg
Troy D. Shelton
FOX ROTHSCHILD LLP
P.O. Box 27525
Raleigh, NC 27611
(919) 755-8700

*Attorneys for Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 21-1196     Caption: Timothy Capps v. Newmark Southern Region, LLC; Does 1-25

Pursuant to FRAP 26.1 and Local Rule 26.1,

Timothy Capps
(name of party/amicus)

 

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO


2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:




3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?            ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?            ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew Nis Leerberg                    Date: _____03/09/2021_____

Counsel for: Appellant Timothy Capps

Print to PDF for Filing        Reset Form

# TABLE OF CONENTS

**Page:**

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 2

ISSUES PRESENTED FOR REVIEW .................................................... 3

STATEMENT OF THE CASE .............................................................. 3

    A.    Capps Begins Working at Newmark ...................................... 3

    B.    Capps Signs a New Contract with Newmark......................... 4

    C.    Capps Succeeds at Newmark ............................................... 6

    D.    Changing Dynamics ........................................................... 7

    E.    Newmark Investigates and Offers to Reward Capps............. 8

    F.    Hopper's Equity-Clause Scheme......................................... 11

    G.    Newmark Terminates Capps ............................................... 17

    H.    The Fallout ...................................................................... 19

SUMMARY OF THE ARGUMENT ...................................................... 21

ARGUMENT ................................................................................. 23

    I.    The District Court Misallocated the Burden of Proof on Capps's Contract Claim ...................................................... 23

    II.    Newmark Failed to Prove that Capps Materially and Incurably Breached the Contract ........................................... 25

A.    Because Newmark failed to give notice and an opportunity to cure, it had to prove that the alleged breaches were material *and* incurable ........................ 25

B.    The district court failed to apply the law governing curability .................................................................... 28

C.    Newmark did not prove that Capps engaged in unprofessional behavior that constituted a material and incurable breach of contract ................................. 30

       1.    The district court did not find that Newmark's purported causes for termination were material breaches........................................ 30

       2.    The district court's opinion does not demonstrate materiality or incurability ........................ 32

D.    Newmark did not prove that any equity-clause issues warranted for-cause termination ........................ 39

       1.    Capps did not know about or participate in Hopper's promotion of the equity clauses .......... 40

       2.    Hopper's promotion of the equity clauses was not an incurable breach of contract by Capps................................................................ 45

III.   The District Court Erred in Dismissing Capps's Other Claims on the Pleadings ....................................................... 49

A.    The district court erred by refusing to make an *Erie* guess .................................................................. 49

B.    The district court erred by dismissing Capps's claim for tortious interference with contract ............. 58

C.    The district court erred by dismissing Capps's claim for civil conspiracy............................................ 60

D.    The district court erred by dismissing Capps's un-
        fair-practices claim......................................................63

REQUEST FOR REASSIGNMENT ON REMAND ...............................66

CONCLUSION ........................................................................68

STATEMENT REGARDING ORAL ARGUMENT ...............................69

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Adelphia Recovery Tr. v. Bank of Am.,*
    390 B.R. 64 (S.D.N.Y. 2008) ......................................................... 57

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.,*
    219 F.3d 519 (6th Cir. 2000) ....................................................... 57

*Alexander v. Alexander,*
    792 S.E.2d 901 (N.C. Ct. App. 2016) ........................................ 64

*Anacapa Tech., Inc. v. ADC Telecommunications, Inc.,*
    241 F. Supp. 2d 1016 (D. Minn. 2002) .................................... 29

*Bausch & Lomb Inc. v. Bressler,*
    977 F.2d 720 (2d Cir. 1992) ....................................................... 27

*Blow v. Shaughnessy,*
    364 S.E.2d 444 (N.C. Ct. App. 1988) .............................. 52, 53, 55

*Bottom v. Bailey,*
    767 S.E.2d 883 (N.C. Ct. App. 2014) ........................................ 55

*Boykin v. Bennett,*
    118 S.E.2d 12 (N.C. 1961) .................................................. 52, 53, 56

*Burns v. Gulf Oil Corp.,*
    98 S.E.2d 339 (N.C. 1957) ........................................................... 62

*Burton v. Dixon,*
    131 S.E.2d 27 (N.C. 1963) .......................................................... 62

*Coman v. Thomas Mfg. Co.,*
    381 S.E.2d 445 (N.C. 1989) ....................................................... 54

*Cottrell v. Smith,*
    788 S.E.2d 772 (Ga. 2016) ............................................................ 58

*Daily v. Parker,*
    152 F.2d 174 (7th Cir. 1945) ....................................................... 51

*Dalton v. Camp,*
    531 S.E.2d 258 (N.C. Ct. App. 2000), *rev'd in part on other*
    *grounds,* 548 S.E.2d 704 (N.C. 2001) ........................................ 62

*Dickens v. Puryear,*
    276 S.E.2d 325 (N.C. 1981) ......................................................... 62

*E. Shore Markets, Inc. v. J.D. Assocs. LP,*
    213 F.3d 175 (4th Cir. 2000) ....................................................... 49

*E. Trading Co. v. Refco, Inc.,*
    229 F.3d 617 (7th Cir. 2000) ....................................................... 56

*E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.,*
    564 F. App'x 710 (4th Cir. 2014) ................................................. 67

*Erie R.R. Co. v. Tompkins,*
    304 U.S. 64 (1938) ........................................................... 50, 51, 56

*Everett v. Pitt Cty. Bd. of Educ.,*
    678 F.3d 281 (4th Cir. 2012) ....................................................... 23

*Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.,*
    505 F. Supp. 2d 1178 (D. Utah 2007) ......................................... 57

*Felsen v. Sol Cafe Mfg. Corp.,*
    249 N.E.2d 459 (N.Y. 1969); .................................................. 23, 24

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.,*
    865 F.2d 513 (2d Cir. 1989) ........................................................ 49

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,*
    111 F.3d 284 (2d Cir. 1997) ........................................................ 31

*HAJMM Co. v. House of Raeford Farms, Inc.*,
    403 S.E.2d 483 (N.C. 1991) .......................................................... 63

*Hanson v. Cap. Dist. Sports, Inc.*,
    218 A.D.2d 909 (N.Y. App. Div. 1995) .......................................... 27

*Hefferman v. Bass*,
    467 F.3d 596 (7th Cir. 2006) .......................................................... 57

*Hilco Transp., Inc. v. Atkins*,
    No. 14-CVS-8677,
    2016 WL 197133 (N.C. Bus. Ct. Jan. 15, 2016) ............................ 63

*In re 4Kids Ent., Inc.*,
    463 B.R. 610 (Bankr. S.D.N.Y. 2011)................................. 27, 33, 38

*In re Am. Ambulette & Ambulance Serv., Inc.*,
    560 B.R. 256 (Bankr. E.D.N.C. 2016) ............................................ 55

*In re Buffalo Sch. Renovation Program*,
    No. 2016-800900,
    2016 WL 7638485 (N.Y. Sup. Ct. Dec. 8, 2016) ............................ 31

*In re Civil Penalty*,
    379 S.E.2d 30 (N.C. 1989) ............................................................. 55

*In re Felt Mfg. Co.*,
    371 B.R. 589 (Bankr. D.N.H. 2007) .............................................. 57

*In re Houston Reg'l Sports Network, L.P.*,
    547 B.R. 717 (Bankr. S.D. Tex. 2016) ........................................... 54

*In re Munford, Inc.*,
    98 F.3d 604 (11th Cir. 1996) ......................................................... 57

*In re N.C. & Va. Warranty Co., Inc.*,
    594 B.R. 316 (Bankr. M.D.N.C. 2018) ......................................... 56

*Insight Tech., Inc. v. FreightCheck, LLC*,
    633 S.E.2d 373 (Ga. Ct. App. 2006) .............................................. 58

*Invest Almaz v. Temple-Inland Forest Prods. Corp.*,
　243 F.3d 573 (1st Cir. 2001) ............................................................ 57

*Jackson v. Bumgardner*,
　347 S.E.2d 743 (N.C. 1986) ............................................................ 54

*Johnson v. Hugo's Skateway*,
　974 F.2d 1408 (4th Cir. 1992) ........................................................ 50

*Kalus v. Prime Care Physicians, P.C.*,
　20 A.D.3d 452 (N.Y. App. Div. 2005) ................................. 26, 27, 33

*King v. Bryant*,
　795 S.E.2d 340 (N.C. 2017) ............................................................ 54

*Krawiec v. Manly*,
　811 S.E.2d 542 (N.C. 2018) ............................................................ 59

*L.K. Comstock & Co. v. United Engineers & Constructors Inc.*,
　880 F.2d 219 (9th Cir. 1989) .......................................................... 26

*Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*,
　957 F.2d 1153 (4th Cir. 1992) ........................................................ 51

*Manpower Inc. v. Mason*,
　377 F. Supp. 2d 672 (E.D. Wis. 2005) ............................................ 29

*McMillan ex rel. McMillan v. Mahoney*,
　393 S.E.2d 298 (N.C. Ct. App. 1990) .............................................. 53

*Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*,
　584 P.2d 968 (Wash. Ct. App. 1978) ............................................... 26

*Muse v. Morrison*,
　66 S.E.2d 783 (N.C. 1951) .............................................................. 62

*Nationwide Mut. Ins. Co. v. United Comput. Cap. Corp.*,
　No. 16340,
　1994 WL 78640 (Ohio Ct. App. Mar. 16, 1994) .............................. 26

*Nicholson v. Hugh Chatham Mem'l Hosp., Inc.*,
266 S.E.2d 818 (N.C. 1980) ..................................................... 53, 67

*O'Neill v. N.Y. Univ.*,
97 A.D.3d 199 (N.Y. App. Div. 2012) ............................................ 24

*Owen v. Com. Union Fire Ins. Co. of N.Y.*,
211 F.2d 488 (4th Cir. 1954) ...................................................... 25

*Pierce v. Ford Motor Co.*,
190 F.2d 910 (4th Cir. 1951) ....................................................... 51

*Potter v. Homestead Pres. Ass'n*,
412 S.E.2d 1 (N.C. 1992) ............................................................. 59

*Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*,
296 F.3d 308, (4th Cir. 2002) .................................................. 51-52

*Q.E.R., Inc. v. Hickerson*,
880 F.2d 1178 (10th Cir. 1989) ................................................... 57

*Ridgway v. Ford Dealer Computer Servs., Inc.*,
114 F.3d 94 (6th Cir. 1997) ......................................................... 24

*Robert Cohn Associates v. Kosich*,
63 A.D.3d 1388 (N.Y. App. Div. 2009) ................................... 31, 32

*Ross v. Garner Printing Co.*,
285 F.3d 1106 (8th Cir. 2002) ...................................................... 24

*Sander v. O'Dwyer*,
No. COA06-631,
2007 WL 2034089 (N.C. Ct. App. 2007)...................................... 60

*Sanders v. Parker Drilling Co.*,
911 F.2d 191 (9th Cir. 1990) ....................................................... 24

*Scudder v. Jack Hall Plumbing & Heating, Inc.*,
302 A.D.2d 848 (N.Y. App. Div. 2003) ........................................ 27

*Seabulk Offshore, Ltd. v. Am. Home Assur. Co.,*
377 F.3d 408 (4th Cir. 2004) ........................................ 26

*Septembertide Pub. v. Stein & Day, Inc.,*
884 F.2d 675 (2d Cir. 1989) .......................................... 31

*Simmons v. Quick-Stop Food Mart, Inc.,*
307 N.C. 33, 296 S.E.2d 275 (1982) ............................. 59

*Songwooyarn Trading Co. v. Sox Eleven, Inc.,*
714 S.E.2d 162 (N.C. Ct. App. 2011)............................ 63

*State ex rel. Cooper v. Ridgeway Brands Mfg., LLC,*
666 S.E.2d 107 (N.C. 2008) .......................................... 61

*State v. Dalton,*
83 S.E. 693 (N.C. 1914) ................................................. 62

*Stetser v. TAP Pharm. Prod., Inc.,*
598 S.E.2d 570 (N.C. Ct. App. 2004)............................ 53

*United Labs., Inc. v. Kuykendall,*
370 S.E.2d 375 (N.C. 1988) .................................... 55, 59

*United States v. Francis,*
686 F.3d 265 (4th Cir. 2012) ........................................ 45

*United States v. Guglielmi,*
929 F.2d 1001 (4th Cir. 1991) ...................................... 68

*United States v. Lopez-Magallon,*
738 F. App'x 577 (9th Cir. 2018) .................................. 66

*United States v. Nicholson,*
611 F.3d 191 (4th Cir. 2010) ........................................ 66

*United States v. Rhynes,*
218 F.3d 310 (4th Cir. 2000) ........................................ 42

*United States v. Robin,*
553 F.2d 8 (2d Cir. 1977) .................................................... 66, 67, 68

*United States v. Watson,*
793 F.3d 416 (4th Cir. 2015) ........................................................ 45

*Urquhart v. Trenkelbach,*
No. 15 CVS 3055,
2017 WL 536318 (N.C. Bus. Ct. Feb. 8, 2017) .............................. 64

*USI Ins. Servs. LLC v. Miner,*
801 F. Supp. 2d 175 (S.D.N.Y. 2011) ....................................... 27, 33

*Volvo Trucks N. Am. v. Dep't of Transp.,*
779 N.W.2d 423 (Wis. 2010) ........................................................ 29

*Wegman v. Dairylea Co-op., Inc.,*
50 A.D.2d 108 (N.Y. App. Div. 1975) ............................................ 23

*Whiteside v. Gill,*
580 F.2d 134 (5th Cir. 1978) ........................................................ 25

*Wilcox v. City of Asheville,*
730 S.E.2d 226 (N.C. Ct. App. 2012) ............................................ 53

*Williams v. Action for Better Cmty., Inc.,*
51 A.D.2d 876 (N.Y. App. Div. 1976) ............................................ 24

*Woods v. City of Greensboro,*
855 F.3d 639 (4th Cir. 2017) ........................................................ 66

**Statutes:**

28 U.S.C. § 1291 ................................................................................ 3

28 U.S.C. § 1332 ................................................................................ 2

28 U.S.C. § 2106 .............................................................................. 67

N.C. Gen. Stat. § 59-61(1)(b) ......................................................... 59

N.C. Gen. Stat. § 59-73......................................................... 59, 60

N.C. Gen. Stat. § 75-1.1................................................ 19, 63, 68

N.C. Gen. Stat. § 75-1.1(a) ................................................... 63

**Rules:**

Fed. R. Civ. P. 12................................................................ 49

Fed. R. Civ. P. 12(b)(6) ...................................................... 40, 49

Fed. R. Evid. 615 ............................................................... 41, 42

**Other:**

19 Charles A. Wright et al., *Federal Practice and*
    *Procedure* § 4507 (3d ed. Westlaw) ................................... 52

28 David D. Siegel, *New York Practice:*
    *New York Contract Law* § 13:12 (2d ed. 2020).............................. 24

Restatement (Second) of Torts § 876 (Am. Law Inst. 1979).................. 53

Restatement of Employment Law § 2.04 (Am. Law Inst. 2015) ...... 35, 36

# INTRODUCTION

New York—like many states—jealously protects the rights of contractors when a company tries to terminate them "for cause" without heed to their contractual rights. Sometimes those protected by these laws are lower-level workers. Other times, they are in a more highly compensated field, like sales. But the law is the same for all.

Here, Tim Capps joined Newmark as a successful commercial real estate broker. Capps negotiated with Newmark for a contract that limited Newmark's ability to terminate their relationship. Under their deal, Newmark could only terminate *for cause* if Capps materially breached his contract. Even then, Newmark could only terminate if it gave written notice of breach and an opportunity to cure. If Newmark failed to meet these requirements, then Capps could only be terminated *without cause*. A lot rode on that distinction; Newmark would save a fortune if it labeled a termination as *for cause*.

Despite these clear restrictions, Newmark surprised Capps with a termination, citing grounds that were not material and depriving Capps of any notice or opportunity to cure.

The heart of this case is whether Newmark was allowed to terminate Capps for cause. It wasn't. So Newmark—not Capps—should have been liable for breach of contract.

The district court decided otherwise, but it misapplied the governing law, making several serious missteps. First, it misallocated the burden of proof to Capps, requiring him to prove a negative. Next, the court failed to ensure Capps materially breached. Then the court ignored Capps's contractual right to cure.

These were all errors of law. The district court also erred in denying at the pleading stage Capps's other bases for Newmark's liability. These errors should be reversed with instructions that Newmark breached the contract through an improper termination. The case should then be remanded for a trial on the improperly dismissed claims and Capps's damages.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter under 28 U.S.C. § 1332 because there was complete diversity and the amount in controversy exceeded $75,000.

After a bench trial, the district court entered judgment on December 22, 2020. The court extended the time to appeal. Timothy Capps timely filed his notice of appeal on February 19, 2021. This Court has jurisdiction over this appeal from the final judgment of the district court under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

Capps presents the following issues for this Court's review:

1. The burden of proving cause for termination lies with the terminating party. Did the district court err by requiring Capps to prove that Newmark lacked cause for termination?

2. Did Newmark prove that Capps materially breached his contract and that Newmark's failure to provide written notice was excused because those breaches were incurable?

3. At the pleading stage, the district court dismissed Capps's claims for aiding and abetting, tortious interference with contract, civil conspiracy, and unfair practices. Were those dismissals erroneous?

## STATEMENT OF THE CASE

**A. Capps Begins Working at Newmark**

Tim Capps has worked as a commercial real estate broker for his entire career. (J.A. 1161-62, 1164). Just as some law firms represent

solely defendants or plaintiffs, Capps exclusively represents tenants in real-estate transactions. (J.A. 1163-64). As is typical, Capps's compensation is based on commissions on completed transactions. Typically, brokerage firms make a 4% commission over the life of a lease, with the commission split 60-40 between the individual broker and the firm. (J.A. 1164, 1395).

Before joining Newmark, Capps worked at a firm called Studley with his business partner, Greg Katz. Capps succeeded at Studley. During his last year there, in 2014, he made $4.5 million. (J.A. 1002, 1165). But Studley was sold and the newly merged company would no longer strictly represent tenants. (J.A. 1165-66). Capps and Katz decided to seek a new opportunity.

In 2014, Capps and Katz began negotiating a new business relationship with Newmark, another brokerage firm. (J.A. 1167, 1514-15).

**B.      Capps Signs a New Contract with Newmark**

In January 2015, Capps entered into a seven-year, independent-contractor agreement with Newmark after negotiations through counsel. (J.A. 1001, 1167, 2276). The deal came with a $1.5 million upfront signing bonus in the form of cash and equity. (J.A. 1167, 1658).

Included in the bonus was a cash advance of $731,250 intended to provide a source of income to Capps during his transition from Studley. (J.A. 1001, 1180-81, 2289). The advance took the form of a promissory note, which would be forgiven at the end of the seven years of the broker agreement. (J.A. 1001-02, 2289).

Capps and Katz brought an entire team—a portable business unit—to Newmark. This included support staff, a financial analyst, and junior brokers. (J.A. 1002). Forecasting future success, Capps and Katz negotiated the right to terminate their broker agreements four years into the seven-year term, allowing them either to renegotiate even more favorable terms with Newmark or take their team elsewhere. (J.A. 1167-68, 2276).

Under the broker agreement, Newmark also had a right to terminate, either "with or without Cause." (J.A. 2276). The agreement defined "cause" as (1) a "material breach" by Capps of the broker agreement that (2) is "not cured within thirty (30) days of written notice." (J.A. 2204, 2276).

Newmark's contractual rights to terminate Capps with or without cause had very different financial consequences. If Newmark had terminated *without* cause, then Capps was entitled to:

- forgiveness of the $731,250 cash advance, (J.A. 2289);

- restricted equity units valued at $563,602, (J.A. 1337, 2364);

- dividend payments on those equity units totaling $68,000 annually, (J.A. 1339-40, 2543);

- the ability to keep working on all pending deals and receive those commissions worth millions of dollars, (J.A. 1383, 2591); and

- release from non-compete obligations, (J.A. 1664-65).

If Capps were terminated *with cause*, however, Newmark would keep that money.

## C.    Capps Succeeds at Newmark

Capps and his team—dubbed the "Critical Transactions Group" or CTG—focused on complex corporate real-estate deals across the country. (J.A. 1002). The team included Katz, Mike Hopper, Monty Harris, and others. (J.A. 1002, 1171-73).

Although CTG worked for Newmark's benefit, CTG was its own legal entity, being a partnership between Katz and Capps. (J.A. 1204, 1209). Out of their shared revenues, Capps and Katz paid for the costs and salaries of their team. (J.A. 1002-03, 1177-78, 2300). Capps's costs were $300,000 per year. (J.A. 2560).

Capps and CTG succeeded at Newmark. Capps was invited to attend Newmark's "top producers" meetings for 2015 to 2018. (J.A. 1003, 1173-74, 2476-82). Capps made $1.5 million in 2016 and $1 million in 2017, not including other benefits. (J.A. 1002, 1165).

## D. Changing Dynamics

But there were growing tensions within the CTG team.

Monty Harris had a long history of alcohol abuse, well known to Katz, Capps, and Newmark CEO Barry Gosin (who knew Harris personally before he joined Newmark). (J.A. 530-31, 591, 1195-96, 1522). Harris had earlier been fired from Studley because of a sexual assault and other drunken misbehavior at a work event. (J.A. 702-04). Gosin allowed Harris to come to Newmark, despite knowing about the intoxicated assault. (J.A. 1516-17, 1522). Harris promised he would stay sober. (J.A. 1196, 1522).

In January 2017, Harris received two-and-a-half months of outpatient treatment for alcoholism. (J.A. 591-92). In July 2017, Harris missed a key meeting with AstraZeneca Pharmaceuticals. (J.A. 1003). The same day, CTG member Mike Hopper told Capps that Harris had relapsed and had recently been belligerently drunk at the airport. (J.A. 1197-99, 1828-31). Indeed, Capps had received nonsensical emails and voicemails from Harris the day before and of the meeting. (J.A. 1192-93). Thus, Capps concluded that Harris had missed the meeting because he was drunk. Katz, however, defended Harris. (J.A. 1201). Later that year, Harris entered in-patient rehab for 22 days. (J.A. 592).

On August 3, shortly after the AstraZeneca meeting, Katz told Capps that he no longer wanted to be partners, and that he was dissolving CTG. (J.A. 1003).

## E.  Newmark Investigates and Offers to Reward Capps

Getting nowhere with Katz, Capps asked Newmark's human resources department to help Harris. (J.A. 1206, 1712). Human Resources Director Lindsay Sherman began an investigation. (J.A. 796-97). When CEO Barry Gosin heard about Harris's airport belligerence, it "really got [him] concerned," and he reached out to Harris directly. (J.A. 1516-17).

Sherman, however, wrote off Harris's alcoholism as unworthy of Newmark's attention.  (J.A. 838-39).

At the same time, and unbeknownst to Capps, Katz was urging Newmark to get involved due to CTG's dissolution and Katz's view that "timing is becoming critical."  (J.A. 2522).  So Newmark redirected its investigation from Harris to Capps.

After talking to Katz *and Harris*, Sherman looked into their allegations that Capps had emotionally abused some CTG team members.  Although Newmark would later rely on these allegations to terminate Capps for cause, and rely on them yet again during pretrial litigation, Newmark virtually abandoned them at trial.  The only witness with personal knowledge that Newmark brought to trial was Mike Hopper, who testified that, while Capps was sometimes "short" and "snippy," he and Capps worked well together and had fun in the process.  (J.A. 1706, 1776-77).  At trial, Newmark's witnesses couldn't even remember whether the travel-record issue was a ground for termination.  (*E.g.*, J.A. 1461-62).

Meanwhile, Capps was still trying to assist Sherman in her investigation into Harris's alcoholism, not knowing that Sherman was building a different case.  Sherman asked Capps to send information about

Harris's travels. (J.A. 1206-07). Believing that Katz was covering for Harris's alcoholism, Capps asked his assistant to pull Katz's travel records, which were then sent to Sherman. (J.A. 1003). Sherman found the records helpful. (J.A. 791-92). CTG members routinely accessed each other's travel records. (J.A. 869, 1208).

Capps did not realize that *he* was the target until the investigation ended. Newmark never spoke to Capps during the investigation. (J.A. 803, 1212). At the end her investigation, Sherman decided not to discipline Capps. (J.A. 801-02, 810).

On August 17, 2017, Sherman called Capps and told him that he had acted unprofessionally toward his colleagues, and that it was wrong to access Katz's travel records. (J.A. 1003-04). Capps apologized for accessing the travel records, if it violated any Newmark policies, and promised not to do so again. (J.A. 73-74). Capps denied acting unprofessionally toward his colleagues. (J.A. 1210-13).

After this meeting, from Sherman's perspective, the investigation was "closed," and "no further action would take place." (J.A. 821, 2203). No written warning was ever given to Capps. Nor did Newmark ever warn Capps that his conduct materially breached his contract.

Quite the opposite: these issues were of little interest to Newmark. The month after the investigation closed, Newmark CEO Gosin and Capps began renegotiating Capps's contract with more favorable terms for Capps. (J.A. 1004, 1216-17, 1519). During those talks, Gosin was aware of the conclusion of the HR investigation but disregarded it because Capps had been "acquitted." (J.A. 1522). Capps still had over three years left on his contract, and Capps's termination option hadn't yet ripened, so it was unnecessary for Newmark to renegotiate. (J.A. 1520-21). But Gosin wanted Capps to stay, so Gosin offered to extend his contract further, increase his commission split with Newmark from 60% to 65%, hire Capps a new team, and pay a $500,000 signing bonus. (J.A. 1521, 1551-52, 2298).

The issues with the travel records and the interactions with colleagues were put to bed—that is, until Newmark resurrected them later as a pretext for terminating Capps for cause, before abandoning them again during trial.

## F.    Hopper's Equity-Clause Scheme

After Katz dissolved CTG, Capps began working solely with Mike Hopper. During that time, Capps and Hopper were pursuing a critical

account with Sonic Automotive. Sonic is a Fortune 500 conglomerate headquartered in Charlotte, North Carolina. (J.A. 1231, 1769, 1975).

Over many months, Capps prepared strategies for Sonic to consolidate its property holdings (including $24 million in leases), expand its call center, and move its headquarters. (J.A. 1236, 2003-04). The lease renewals alone would have brought nearly $5 million in commissions to Newmark. (J.A. 1237-39). Even at trial, Sonic complimented Capps's work as "impressive" and "pretty unbelievable." (J.A. 1981, 1998).

One of Capps's strategies was to consolidate some of Sonic's dealerships and its corporate headquarters into a single building in Charlotte—the 300 South Brevard Street building. (J.A. 1242-45, 1769, 1983-84). Sonic vacillated. In October 2017, Sonic said it was off the table. (J.A. 2624). But by December 2017 and January 2018, Capps had rekindled Sonic's interest and another visit to the property was arranged. (J.A. 1282).

Meanwhile, Hopper hatched a different scheme for the Brevard building. Hopper wanted to find a *developer* to buy the building. Hopper thought the building's current owner would likely be looking to sell at a

discount because the building was not rented and a large debt was maturing—a debt exceeding the building's value.  (J.A. 1777-80).  Hopper thought the current owner would be unable to pay a commission if the building sold.  (J.A. 1780).

Hopper then began drafting and shopping broker agreements around to potential buyers, in which an equity stake in the Brevard building would be given directly to the brokers, in lieu of a commission paid to Newmark and split with the brokers.  The first two agreements that Hopper drafted had equity stakes in the Brevard building going to Hopper and Capps.  (J.A. 3113, 3176).  But Capps's career was built exclusively on tenant-side representation, and he never responded to Hopper's emails and text messages about Hopper's developer-side scheme.  Hopper then revised and sent a draft to a third prospective developer, Holder Properties, providing an equity stake to Hopper and another Newmark broker—Taylor Senter—but excluding Capps.  (J.A. 1801-03).  At trial, Hopper could not explain why he substituted Holder for Capps, offering only that Senter had a contact at Holder and that Hopper was "uber excited" to get hired by a *developer*.  (J.A. 1802-03).

Hopper testified that he never intended to eliminate Newmark's cut of a commission on the proposed transactions. (J.A. 1221, 1850-51). The draft agreements, however, provided equity stakes directly to individual brokers if no commission were paid to Newmark. (*E.g.*, J.A. 3113, 3176). Hopper admitted he was the one who dreamt up the equity clauses, drafted all the agreements with equity clauses, and sent them to the developers. (J.A. 1413-14, 1466, 1572, 1826, 2529).

An important issue at trial was whether Capps knew about the equity clauses that Hopper was shopping around. Without *any* documentary evidence, Hopper testified that he and Capps talked about the details *on the phone*. Capps denied that. (J.A. 1263, 2238). The district court credited Hopper over Capps. Capps challenges that finding.

Capps's position is supported by compelling, undisputed evidence. When Hopper drafted the equity clauses and sent them to the first two prospective buyers—Wheelock and Childress Klein—Capps was having and recovering from emergency back surgery (spinal fusion). (J.A. 1001, 1247, 2490, 2492). Capps was in such extreme pain that he could not walk. (J.A. 1250). During this time, Capps asked Hopper to help with

his clients, including Sonic. (J.A. 198-99, 1783-84, 2491). Again, Wheelock and Childress are developers, and Capps has never represented a developer—or anyone besides a tenant—in a deal. (J.A. 1261).

Although Hopper emailed drafts of the agreements to Capps for his review, Capps testified that he never read the emails or opened the attachments because he was only responding to emails and text messages that involved his own clients. (J.A. 1256, 1258-60, 1752-56). Newmark admitted that it could have and should have looked at the metadata of these documents to determine whether Capps ever opened them, but it never did. (J.A. 1480-81, 1598-99). Moreover, Capps had no reason to think the broker agreements needed his review; Hopper had never edited a broker agreement, nor was Hopper allowed to edit Newmark's standard terms. (J.A. 1258). Although Capps and Hopper texted and emailed many times every day, there was not a single text or email from Capps referring to Hopper's equity scheme. (J.A. 1258-59, 1261-62, 1823-24, 1831-36, 3116). Capps only emailed and texted about the Brevard building when it pertained to Sonic. (J.A. 1755).

Hopper also had motive to misrepresent Capps's involvement. Hopper had been working with Katz since 2005, at Studley, and he worked

for Katz and Newmark at the time of the trial. (J.A. 1762, 1826). Hopper testified that Katz is "family," and that his "allegiance" will "always" be with Katz over Capps. (J.A. 1827). For example, right after Harris skipped his meeting with AstraZeneca, Katz texted Harris, "Hopper is contained." (J.A. 560). And before Newmark interviewed Hopper about the equity clauses, Katz "loaned" Hopper $35,000. (J.A. 1817). After the interview, Hopper texted Katz, "Visualize Vegas. No more Tim [Capps] and a $20 million team." (J.A. 1814-17).

Capps also had no reason to pursue the equity clauses. While Hopper was pursuing the agreements with developers, Capps was still pursuing the Brevard-building strategy with Sonic. Capps could not pursue that strategy with the equity clauses in place—he couldn't be both Sonic's tenant-broker and its future landlord. That would be like an attorney representing both the plaintiff and defendant.

Hopper eventually got a developer (Holder) to sign an agreement for the Brevard building—one without the proposed equity clauses. (J.A. 1469). Even that agreement caused headaches for Capps because it had an exclusivity provision that would've killed Capps's Brevard strategy

with Sonic. (J.A. 3182). Upon learning of the Holder agreement in November 2017, (J.A. 1267-68), Capps made Newmark cancel the deal so that he could keep working with Sonic, (J.A. 1282-83, 1689, 2631-32).

In late 2017, Newmark learned about Hopper sending agreements with the equity clauses to prospective clients, and Newmark's in-house attorneys, Emily Milligan and Bob Graubard, began investigating. (J.A. 953, 3044). They interviewed Capps, Hopper, and Senter in December. (J.A. 1004, 1409-12, 2374). They chose not to interview any of the developers to whom Hopper sent the agreements. (J.A. 1457, 1921-22). When presented with the agreements Hopper drafted, Capps told Newmark that it would be wrong to use those equity clauses and that Capps wasn't aware Hopper was sending agreements with equity clauses to anyone. (J.A. 1277-79, 2338, 2543).

## G.    Newmark Terminates Capps

Capps then heard nothing about the issue. Three months later, on March 21, 2018, Newmark terminated Capps without notice and without an opportunity to cure—allegedly for cause. (J.A. 1007).

A formal letter of termination followed. The letter was drafted by Milligan. (J.A. 1449, 1496-97). The letter cited three grounds for termination: (1) unprofessional behavior toward colleagues; (2) accessing of Katz's travel records; and (3) Capps's role in Hopper's equity-clause scheme. (J.A. 2343-44). Milligan knew nothing about grounds (1) and (2); she drafted the letter without ever talking to Sherman, who had investigated those issues. (J.A. 846-49).

At trial, no one from Newmark would take responsibility for Capps's termination. Milligan, who testified first for Newmark, said CEO Barry Gosin decided to terminate. (J.A. 1475-76). Next, Gosin, who did not hear Milligan's testimony, denied being the decisionmaker: "it was really in the hands of Lou [Alvarado] and other people in the organization, and they decided that they would terminate Tim [Capps]." (J.A. 1525). Finally, Alvarado, Newmark's corporate representative at trial, who sat through all the testimony, said that the "company" and "team" decided to terminate Capps. (J.A. 1917-18).

After Newmark terminated Capps for cause, and after Capps sued Newmark, Newmark issued disciplinary letters to Hopper and Senter.

(J.A. 2373-74). That was about six months after Newmark learned about the equity-clause issue. Neither was terminated.

## H. The Fallout

Even before Capps's termination, in December 2017, Katz sued Capps about disputed commissions, and Capps counterclaimed. (J.A. 36-45). After Capps was terminated, Capps sued Newmark and Harris. (J.A. 46-79).

The Court consolidated the cases. (J.A. 127). The Court then stayed Capps's claims against Newmark and ordered Capps, Katz, and Harris to let Newmark arbitrate their commissions disputes with each other. (J.A. 198-215). Rather than deal with Newmark, the three brokers just settled with each other. (J.A. 216-18).

Capps, however, reserved his claims against Newmark. Capps sued Newmark for breach of contract, aiding and abetting breach of fiduciary duty, tortious interference with prospective business relationships, tortious interference with contract, defamation, civil conspiracy, breach of the implied duty of good faith and fair dealing, and a violation of N.C. Gen. Stat. § 75-1.1. (J.A. 68, 72-77). Newmark moved to dismiss. (J.A.

80-83).  The district court dismissed all but the contract claim.[1]  (J.A. 162-63).  Newmark counterclaimed for repayment of Capps's cash advance. (J.A. 164-86).

Later, Capps moved to amend his complaint to reinstate claims for breach of implied duties and prospective tortious interference.  (J.A. 219-249).  The district court allowed reinstatement of the implied-duty claim but not the tortious-interference claim.  (J.A. 303-06).

The district court held a four-day bench trial starting in September 2020.  The district court then entered a written opinion.  (J.A. 2199-2251). The court determined that Newmark properly terminated Capps for cause.  Thus, Capps had to repay the cash advance.  The court entered judgment for Newmark in the amount of $767,085.88, subject to a setoff of $375,521.00 for Newmark commissions had admittedly withheld.  (J.A. 2252).

---

[1] Capps originally sued two entities:  Newmark Southern Region, LLC, and Newmark Company Real Estate, Inc.  (J.A. 46).  The district court dismissed all claims against the latter.  (J.A. 163).  This brief uses "Newmark" to refer to the former.

## SUMMARY OF THE ARGUMENT

The district court erred in awarding judgment for Newmark after a bench trial, and in dismissing Capps's other, non-contractual claims at the pleading stage.

The bench opinion on the parties' competing contractual claims suffers from legal and factual errors.

First, the district court misallocated the burden of proof to Capps on the contract claims. Under governing law, Capps only had to prove he was terminated without notice. Because that was undisputed, Newmark bore the burden of proving that (1) Capps materially breached his contract, and (2) Capps's breaches were incurable. The district court got it backwards, which itself is reversible error.

Next, the district court erred by failing to determine whether two of Newmark's three grounds for termination were *material* breaches. The court also erred by failing to conduct a "curability" analysis for *any* of the three grounds.

Finally, even if the district court had done a proper materiality and curability analysis in the bench opinion, reversal would still be in order. Legally, Capps did not materially breach, and, even if he did, his breaches

were curable.  Factually, the court clearly erred in finding that Capps participated in Hopper's equity-clause scheme.

At the pleading stage, the district court made additional errors:

- The court dismissed Capps's claim against Newmark for aiding and abetting a breach of fiduciary duty, but erroneously refused to make an *Erie* prediction.

- The court dismissed Capps's claim for tortious interference with contract because, it held, a partnership is over when it dissolves.  That was wrong because a partnership continues after dissolution, until it is wound up.

- The court dismissed a civil-conspiracy claim because Capps did not plead that Newmark committed an underlying tort.  But Capps pleaded an independent tort committed by Newmark's co-conspirators, which suffices.

- Finally, the court held that Newmark's misconduct had no impact on commerce.  But Newmark's misconduct affected several commercial relationships, warranting reinstatement of Capps's statutory unfair-practices claim.

## ARGUMENT

## I. The District Court Misallocated the Burden of Proof on Capps's Contract Claim.

At trial, Newmark should have borne the burden of proving that it validly terminated Capps for cause. To prove for-cause termination, Newmark had to show that Capps materially breached the contract. And because Newmark terminated Capps without notice and without an opportunity to cure any breach, Newmark *also* had to prove Capps's breaches (if any) were incurable. The district court erred by allocating these burdens to Capps. This Court reviews the district court's allocation of the burden of proof de novo. *Everett v. Pitt Cty. Bd. of Educ.*, 678 F.3d 281, 288 (4th Cir. 2012).

Under New York law,[2] *Newmark* should have borne the burden of proving that it had cause to terminate Capps. Capps had the burden of proving that a contract existed and that it was terminated before its term was complete. *See Felsen v. Sol Cafe Mfg. Corp.*, 249 N.E.2d 459, 460 (N.Y. 1969); *Wegman v. Dairylea Co-op., Inc.*, 50 A.D.2d 108, 111 (N.Y. App. Div. 1975). But those elements are not disputed. Thus, "the burden

---

[2] The parties agree that the contract is governed by New York law. (J.A. 228-29).

fell upon" Newmark to prove that had cause for termination. *See Felsen*, 249 N.E.2d at 460; *O'Neill v. N.Y. Univ.*, 97 A.D.3d 199, 209-10 (N.Y. App. Div. 2012); 28 David D. Siegel, *New York Practice: New York Contract Law* § 13:12 (2d ed. 2020).

Here, the district court flipped the burdens. It faulted Capps for failing to prove a negative—that he had *not* materially and incurably breached. (J.A. 2247-49). Newmark was only held to the burden of proving that Capps had not repaid the promissory note. (J.A. 2250). As New York courts have held, misallocating the burden of proof on this issue is reversible error. *E.g.*, *Williams v. Action for Better Cmty., Inc.*, 51 A.D.2d 876, 876-77 (N.Y. App. Div. 1976) (holding that it was error for the trial court to put the burden on the plaintiff "to prove that his discharge was without justification" because "in fact defendant had the duty to plead and prove it as a defense"). In fact, this would be an error in many jurisdictions, not just New York. *See, e.g.*, *Ross v. Garner Printing Co.*, 285 F.3d 1106, 1113 (8th Cir. 2002) ("[I]t is generally held that the employer has the burden of proving cause for termination."); *Sanders v. Parker Drilling Co.*, 911 F.2d 191, 194 (9th Cir. 1990) (similar); *Ridgway v. Ford Dealer Computer Servs., Inc.*, 114 F.3d 94, 97 (6th Cir. 1997) (similar).

An error as fundamental as this requires reversal or vacatur standing alone, even though this was a bench trial. *See Owen v. Com. Union Fire Ins. Co. of N.Y.*, 211 F.2d 488, 489 (4th Cir. 1954) (vacating judgment after bench trial based on misallocation of the burden of proof); *Whiteside v. Gill*, 580 F.2d 134, 139 (5th Cir. 1978) (holding that the misallocation of the burden of proof is not harmless).

## II. Newmark Failed to Prove that Capps Materially and Incurably Breached the Contract.

Besides misallocating the burden, the district court also erred by determining that Capps was properly terminated for cause.

In the termination letter, Newmark gave three grounds for terminating its contract with Capps:  acting unprofessionally toward colleagues, accessing Katz's travel records, and joining Hopper's equity-clause scheme.  (J.A. 2343-44).  Because of the lack of written notice and opportunity to cure, Newmark had the burden of proving that these purported grounds were material *and* incurable breaches.

### A. Because Newmark failed to give notice and an opportunity to cure, it had to prove that the alleged breaches were material *and* incurable.

The contract required Newmark to give Capps a written notice of any material breaches, and, after giving notice, an opportunity to cure

those breaches.  Newmark did neither.  Thus, at trial Newmark was stuck arguing that its failure to provide notice and cure was harmless because the three breaches it relied upon were incurable.  The district court failed to engage in any curability analysis, which itself requires reversal.

Curability is a question of law reviewed de novo.  *See, e.g.*, *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004) (interpretation of contract is reviewed de novo); *L.K. Comstock & Co. v. United Engineers & Constructors Inc.*, 880 F.2d 219, 231 (9th Cir. 1989) (curability reviewed de novo); *Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 584 P.2d 968, 970 (Wash. Ct. App. 1978) (same); *Nationwide Mut. Ins. Co. v. United Comput. Cap. Corp.*, No. 16340, 1994 WL 78640, at *4 (Ohio Ct. App. Mar. 16, 1994) (same).

Under New York law, a party to a contract is prohibited from terminating the contract for cause if it breaches its notice-and-cure obligations.  It is "irrelevant" whether Newmark had cause to terminate Capps if Newmark violated notice-and-cure obligations.  *Kalus v. Prime Care Physicians, P.C.*, 20 A.D.3d 452, 454 (N.Y. App. Div. 2005).  Newmark's

failure renders the discharge "ineffective." *Scudder v. Jack Hall Plumbing & Heating, Inc.*, 302 A.D.2d 848, 851 (N.Y. App. Div. 2003). When a terminated party is deprived of notice and an opportunity to cure, that party is entitled to judgment as a matter of law, even if the record shows actual cause for the termination. *See, e.g.*, *Kalus*, 20 A.D.3d at 454 (granting summary judgment to terminated contract party due to counter-party's failure to give notice and opportunity to cure); *Hanson v. Cap. Dist. Sports, Inc.*, 218 A.D.2d 909, 911 (N.Y. App. Div. 1995) (same). That's because "terminating a contract without complying with the notice and cure provisions therein is itself a material breach." *In re 4Kids Ent., Inc.*, 463 B.R. 610, 683 (Bankr. S.D.N.Y. 2011); *see also Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (explaining that party "committed a material breach by terminating" without adequate notice). Without notice and an opportunity to cure, "there can be no breach" by the terminated contractor. *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 181-82 (S.D.N.Y. 2011) (collecting cases).

Because of this mountain of adverse case law, Newmark had to prove that its failure to provide notice and opportunity to cure was ex-

cused because the breaches were incurable. As explained below, Newmark failed to meet its burden of proof on this issue. And because Capps could not have been validly terminated for cause, judgment should have been entered in his favor on both his own contract claim and Newmark's counterclaim.

## B. The district court failed to apply the law governing curability.

Despite the lack of evidence, the district court determined that all the breaches were incurable. But the court gave no explanation for its conclusions, nor did the court cite any supporting evidence. (J.A. 2239, 2249).

Nor did Newmark's argument for incurability make sense. Newmark argued that Capps's breaches were incurable because the past can never be undone: Capps "could not erase" his access into Katz's flight records, "could not un-conceive the Equity Clause concept," nor could Capps "take back his misstatements to Newmark's investigators." (J.A. 2172). A material breach, says Newmark, cannot be cured without a time machine.

Courts have rejected exactly that kind of illogic. For instance, the Wisconsin Supreme Court has rejected the idea that cure "requires restoration to the *status quo ante* or repair of all harm done by the breach." *Volvo Trucks N. Am. v. Dep't of Transp.*, 779 N.W.2d 423, 433 (Wis. 2010). As another court put it, "[a]n incurable breach is not, as plaintiffs assert, a material breach that goes to the essence of the contract [but] . . . is either one that the contract provides no opportunity to cure or one that cannot logically be cured, such as a franchisee's failure to meet a sales quota within a specified time." *Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 677 (E.D. Wis. 2005). Capps's contract with Newmark did not suggest that there were *any* types of incurable breaches.

Cure happens when a party "stop[s] the offending conduct and . . . substantially perform[s] the contract." *Id.* Thus, if the breaching party substantially performs after the material breach, then "the injured party only has a cause of action for partial breach and is not allowed to terminate the contract." *Anacapa Tech., Inc. v. ADC Telecommunications, Inc.*, 241 F. Supp. 2d 1016, 1020 (D. Minn. 2002). Newmark has no such damages.

The district court erred as a matter of law by applying none of the principles governing curability. That failure requires reversal.

## C. Newmark did not prove that Capps engaged in unprofessional behavior that constituted a material and incurable breach of contract.

Even if the court had properly applied the law, Newmark still failed to prove that any of the alleged breaches were material and incurable. The first two of Newmark's grounds for termination were that Capps was unprofessional toward colleagues and had asked his assistant to access Katz's travel records. (J.A. 2343). But neither ground could constitute cause.

### 1. The district court did not find that Newmark's purported causes for termination were material breaches.

Neither ground supported for-cause termination because neither was a material breach of the contract. Only a material breach of contract could constitute a ground for cause-based termination. (J.A. 2276). The district court did not conclude that these grounds constituted material breaches, yet it relied on these grounds to enter judgment for Newmark. That legal error on a central issue requires reversal all by itself.

"Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'" *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (quoting *Septembertide Pub. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)). In other words, the party asserting a material breach must prove that the other's "breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Id.* This usually requires proof that the non-breaching party has been "prejudiced or damaged by lack of full performance." *In re Buffalo Sch. Renovation Program*, No. 2016-800900, 2016 WL 7638485, at *9 (N.Y. Sup. Ct. Dec. 8, 2016).

A case from the real estate brokerage context provides a helpful example. In *Robert Cohn Associates v. Kosich*, a broker sued to recover its commissions when the seller prematurely terminated the exclusive brokerage agreement, and then sold with a different broker. 63 A.D.3d 1388, 1388 (N.Y. App. Div. 2009). The seller claimed a right to terminate because the broker had materially breached the contract. *Id.* at 1389. Indeed, the broker had inadequately advertised the property, made errors in its listings, and poorly communicated with the seller. *Id.* at 1389-90. Yet the appellate division held that "[e]ven if true, none of these claims"

would constitute a material breach. *Id.* at 1390. These issues did not go to the heart of the agreement. Thus, the seller failed to carry its burden, and the court affirmed summary judgment for the terminated broker. *Id.*

Likewise here. Not only were the alleged breaches immaterial, but the district court failed to even determine materiality. For two of the termination grounds—unprofessional behavior and accessing Katz's travel records—the court *did not determine* that this conduct materially breached the contract, nor did the court make findings that would sustain that legal conclusion. (J.A. 2247-49). The only materiality determination that the district court made was for the equity-clause issue. (J.A. 2248). The court's failure to find that the other two asserted grounds for termination were material breaches means that court erred in relying on those grounds to conclude that Capps was properly terminated for cause.

### 2. The district court's opinion does not demonstrate materiality or incurability.

Even if the district court had determined that Capps materially and incurably breached the contract, reversal would still be in order because those conclusions would be incorrect.

First, the alleged unprofessional conduct was not a material or incurable breach because Newmark concluded that the conduct warranted

only an oral warning.  At the end of Newmark's investigation, Human Resources Director Lindsay Sherman decided not to discipline Capps. (J.A. 801-02, 810).  She believed that a verbal warning sufficed.  (J.A. 802, 811).  Alvarado agreed.  (J.A. 1894).  Thus, from their perspective this matter was "closed" after they spoke with Capps and that "no further action would take place."  (J.A. 821, 2293).

Of course, this verbal warning did not satisfy the notice requirement because the contract required "written" notice.  (J.A. 2276).  The requirement that a notice be in writing is not a mere formality.  Written notice "serve[s] the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contractual partner and an actual threat of termination."  *4Kids Ent*, 463 B.R. at 683 (quoting *USI Ins.*, 801 F. Supp. 2d at 181).  Thus, an employee's "performance review" does not constitute notice either because a written notice must specifically identify a party's conduct "as failures or breaches constituting cause" for termination.  *Kalus*, 20 A.D.3d at 453. By telling Capps that this matter was closed, Newmark told Capps that no cure was required.

To be clear, Newmark knew how to comply with the written notice requirement. After it was sued by Capps, Newmark sent a written notice to Hopper about his promotion of the equity clauses. (J.A. 2373). The notice advised Hopper that he was in breach, and that the document itself put him on notice "that any similar actions may result in the ***for cause*** termination of his association with Newmark." (J.A. 2373) (emphasis added). The notice also provided Hopper with an opportunity to cure by sending all brokerage agreements in the future to Graubard for review before the agreements were sent to clients. (J.A. 2373).

That is what notice and cure looks like. Neither was offered to Capps.

Second, Newmark did not believe that the purported conduct was serious enough to be material or incurable. Over a month after HR closed its investigation, Newmark CEO Barry Gosin engaged in contract negotiations with Capps. (J.A. 1536-38, 2298-99, 2551). At the time, Capps still had over three years left on his contract with Newmark. (J.A. 1520). Because of Capps's obligation, Newmark didn't need to renegotiate Capps's contract or pay him anything extra; as Gosin testified, "I had already paid him." (J.A. 1520). But "as painful as it was," Gosin wanted

Capps to stop feuding with Katz and keep being a top performer for New-mark. (J.A. 1520-21). So Gosin offered to extend Capps's contract, add a $500,000 signing bonus, increase his commission split, and hire Capps a new team so that he "could build whatever [he] want[s]." (J.A. 1521, 1551-52, 2298-99). When he made this offer, Gosin *already knew* that HR had "acquitted" Capps. (J.A. 1522). Gosin wanted Capps "focused on staying." (J.A. 1551).

This part of Gosin's testimony made sense because Newmark has forgiven far worse. *Cf.* Restatement of Employment Law § 2.04 cmt. e (Am. Law Inst. 2015) ("The cause limitation also requires the employer to apply the grounds for termination in a regular and even-handed man-ner."). For example, Monty Harris was fired from his previous job be-cause of sexual assault and harassment. At a work event, he drunkenly called a female colleague a "bitch," told her to perform oral sex on him, and pinched another female colleague on her bottom. (J.A. 702-04). When Gosin rehired Harris to return to Newmark, he knew about his alcoholism and misconduct. (J.A. 1516-17). Even though Harris's alco-holic problems continued at Newmark, (J.A. 591-96), Newmark didn't

care, (J.A. 839). Gosin extended Capps's contract for the same reason he rehired Harris, despite Harris's baggage. (J.A. 1522).

Similarly, the conduct Newmark pointed to was common among CTG members. It's common for Newmark's brokers to curse, (J.A. 925), and it wasn't unusual for Katz to yell at CTG members, (J.A. 887). Harris even told Capps that he wanted to "f**k" Capps's wife. (J.A. 651). CTG members used "colorful language routinely." (J.A. 1717). None of the CTG team members was ever disciplined or even warned about this conduct—except Capps. As the Restatement notes, "[p]ersonality concerns not affecting job performance or the operation of the employer's business typically do not suffice as 'cause' justifying termination of definite-term employment." Restatement of Employment Law § 2.04 (Am. Law Inst. 2015) reporter's note to cmts. b and c; *accord id.* illus. 4.

The disconnect between HR and in-house counsel reveals how Capps's conduct got upgraded from trivial to material. HR Director Lindsey Sherman was solely responsible for the investigation into Capps's allegedly unprofessional behavior. (J.A. 906). After she finished the investigation in August, she considered a verbal warning sufficient and closed the file. (J.A. 815, 821-22, 2293-97, 2615).

The issue evaporated but sprung back to life more than six months later, when Newmark's in-house counsel, Emily Milligan, began drafting a termination letter to Capps on March 1, 2018. (J.A. 3251-52). At that time, the decision to terminate Capps had not even been made. *See* (J.A. 2356-63). In the letter, Milligan cited Capps's unprofessional behavior as a material and incurable breach. (J.A. 2343). But neither Milligan nor anyone else consulted Sherman, Newmark's sole investigator, about the conduct. (J.A. 846-49). Milligan knew nothing about the materiality or curability of the conduct. (J.A. 1463-64). Nor was she aware that Gosin considered the conduct so insignificant that he offered to extend Capps's contract, increase his commission split, and pay a $500,000 sweetener. (J.A. 1464). Milligan—*the attorney who drafted the letter*—didn't even know who decided to include the unprofessional behavior as a ground for termination. (J.A. 1460).

Milligan's surprise reliance on the "acquitted" conduct, (J.A. 1522), showed her ignorance of New York law. She testified that she would be fine terminating an employee for cause based on conduct that happened six months earlier, "eighteen months earlier," or "three years earlier." (J.A. 1461). Under Newmark's reasoning, it can decline to give written

notice, wait until the day before the contract expires, and then surprise the employee or contractor with a for-cause termination.

It's doubtful that Newmark's logic is the law anywhere, but it's certainly not the law in New York. Under New York law, "it is inequitable for one party to induce reliance by the other party through its course of conduct, only to abruptly terminate the contract without a final chance to cure." *4Kids Ent.*, 463 B.R. at 689. In fact, even if Newmark had ended its HR investigation with a formal written notice and demand for cure, the intervening contractual "negotiations after a cure period has expired" would have required "an additional notice and opportunity to cure . . . prior to termination." *Id.* at 688 (collecting cases).

Finally, even if Capps's conduct had been a material breach, it was curable or cured by the time of termination. The purported conduct that Newmark cited all involved Capps's interactions with CTG members. But Capps and Katz's CTG partnership was already dissolved by August 2017. (J.A. 1003). After the HR investigation ended in August 2017, the only one of Capps's former colleagues that he was working with was Mike Hopper. (J.A. 1230-32). And Hopper was the only colleague of Capps

that testified at trial. He testified that he and Capps worked well together and had fun in the process. (J.A. 1776-77). Hopper, of course, was *Newmark's* witness, and even he rebutted Newmark's argument that Capps's conduct was incurably unprofessional. Newmark offered no evidence that the conduct persisted.

In sum, the undisputed evidence at trial proved Capps's behavior toward his colleagues and his access of Katz's travel records did not constitute material, incurable breaches of contract. If the conduct was so horrendous, why did Newmark offer to extend his contract, increase his commissions split, and pay out half a million dollars? The district court never concluded that the conduct was a material breach, and it erred in finding the conduct to be incurable. Newmark breached the contract when it terminated him on these grounds without notice and chance to cure.

**D.   Newmark did not prove that any equity-clause issues warranted for-cause termination.**

At trial, Newmark also failed on its burden as to Hopper's promotion of the equity clauses. Factually, the district court clearly erred in

finding that Capps had knowingly participated in Hopper's conduct. Legally, the district court erred in concluding that the conduct—even if it occurred—was an incurable breach of contract.

### 1. Capps did not know about or participate in Hopper's promotion of the equity clauses.

The trial court found that Capps knew about and participated in Hopper's promotion of the equity clauses to developers. The court's findings were clearly erroneous. *See* Fed. R. Civ. P. 52(a)(6).

The district court's initial error was downplaying Hopper's leading role. Hopper admitted that the equity clauses were his idea, and he personally drafted them. (J.A. 1466). And Hopper was not some confused junior broker, as the court suggested. (J.A. 2223). Rather, by the time Hopper drafted the equity clauses, he had been working as a commercial broker for over twelve years, (J.A. 1763-65), and Capps was only six years his senior, (J.A. 1161, 1763). Hopper was making a million dollars a year at Newmark. (J.A. 1172). In short, he was a "senior broker." (J.A. 1172).

The court also found that Capps controlled Hopper's discussions with Capps's clients, (J.A. 2223), but that finding was irrelevant for the equity-clause issues. The clients with which Hopper was pursuing the equity clauses were not Capps's clients. (*E.g.*, J.A. 1260-61). Rather,

these prospective clients were developers, and Capps had never represented developers. (J.A. 1260-61).

The district court also downplayed the most objective evidence in the case—the written evidence. Despite Capps being a prolific texter and emailer, he *never* mentioned the equity clauses to Hopper or anyone else. (J.A. 1823-24). Although Hopper sent Capps multiple emails and texts draft agreements with the developers that included the equity clauses, Capps never responded to any of them. (J.A. 1258-59, 1261-62, 1823, 1834-36, 3116). Fed up with Capps's non-responsiveness, Hopper switched to working with Senter, sending draft agreements to Senter's client, Holder, and leaving Capps's name off the drafts. (J.A. 1801-02). Hopper had no explanation for the sudden switch, except being "uber excited" to close a deal. (J.A. 1803). The only reasonable inference is that Capps must not have been involved, such that Hopper felt free to reassign the equity to someone else.

The district court even swept away Hopper's bald violation of the sequestration order for trial. (J.A. 2229-30). The parties had agreed to witness sequestration under Rule 615 of the Federal Rules of Evidence.

(J.A. 1143-45). But the night before his testimony, Hopper met over dinner with Newmark's corporate representative (and counsel)—a witness who had heard all the testimony presented thus far. (J.A. 1840-43). That violated Rule 615. *See, e.g.*, *United States v. Rhynes*, 218 F.3d 310, 317 (4th Cir. 2000) ("Sequestration requires that witnesses not discuss the case among themselves or anyone else . . . ."). The *only* evidence supporting Newmark's case was Hopper's testimony, but that testimony was procured in violation of Rule 615.

Next, the district court ignored that the most relevant evidence in the case was never introduced, despite being within Newmark's control: the metadata showing whether Capps ever opened the draft brokerage agreements that Hopper emailed to him. Newmark never reviewed the metadata, (J.A. 1480-81), but admitted that it "probably would have been a good idea" to do so, (J.A. 1598). Indeed, Newmark produced metadata for *other* documents in the case. (*E.g.*, J.A. 3251-52).

The district court also ignored that the other most probative evidence was not introduced either: testimony from the developers who received equity-clause agreements. Newmark could have used this evidence to determine whether Capps had ever discussed the equity clauses

with the developers. But it didn't do that. (J.A. 1457, 1587-98). Newmark tried to justify this flub by saying that it didn't want the developer-clients to think poorly about Newmark. (J.A. 1523, 1573). But that made no sense because Hopper had already emailed the clauses to the developers. (J.A. 1793, 1796, 1801). If the equity clauses mattered, Newmark should have wanted the developers to know that it was investigating.

The district court also erred by finding that Capps had a financial incentive to roll the dice with Hopper's equity-clause scheme. (J.A. 2224). Simple math dispels that misconception. The building was worth about $35 million, so Capps would have received about $3.5 million from a *sale*—as contemplated by the clauses Hopper drafted. (J.A. 1491, 3176-81). Per Hopper, *less* than 10% of deals close. (J.A. 1762). So Capps's "expected income" on the deal was *less than $350,000*. By contrast, Capps was paid $4.5 million in 2014, $1.5 million in 2016, and $1 million in 2017, (J.A. 1002, 1165), and stood to earn $3 to $5 million *per year* if Capps's Sonic deal closed instead. (J.A. 1283, 2631). The district court was wrong to think that Capps would irrationally gamble his career to pursue Hopper's half-baked scheme on behalf of the wrong type of client

for a chance at earning significantly less than he would if he closed *his* Brevard deal with his own client.

Indeed, the district court failed to realize that the equity clauses would have been a disaster for the lucrative deal Capps was pursuing with Sonic. Sonic had many leases expiring at once, and Capps was working on an integrated strategy for Sonic across the country. (J.A. 1236-46). One important feature of the strategy was to consolidate Sonic's dealerships and headquarters into the Brevard building. (J.A. 1245-46, 1770, 1983-84). After touring the building on October 23, 2017, Sonic said that it was not interested in the Brevard opportunity, but Capps was still in talks with Sonic the very next day. (J.A. 2624, 3146). Capps also did not let go of the Brevard opportunity for Sonic. By December 2017, the head of global strategy for Sonic asked to tour the property in January 2018. (J.A. 1282). But by that point, Hopper had entered into a brokerage agreement with the *developer* Holder for the Brevard property. (J.A. 3182-84). That presented a major conflict of interest because Newmark could not both represent a developer-owner and a prospective tenant for the same building. (J.A. 1282-83, 1685). Capps therefore made Newmark cancel the Holder deal so that Capps could keep working with

Sonic. (J.A. 2631-32).[3] But the district court's findings assumed Capps would risk this deal for equity clauses drafted by Hopper, who had no experience or authority to draft such clauses.

At trial, these were undisputed facts. Capps—by merely following his own self-interest—would never have participated in Hopper's equity-position misadventure. The district court erred by finding otherwise. Regardless if any of the district court's errors individually constitutes clear error, "cumulatively" they create "the definite and firm conviction that a mistake has been committed." *United States v. Watson*, 793 F.3d 416, 429 (4th Cir. 2015) (quoting *United States v. Francis*, 686 F.3d 265, 273 (4th Cir. 2012)). That requires reversal.

### 2. Hopper's promotion of the equity clauses was not an incurable breach of contract by Capps.

Even if Newmark had proven that Capps participated in Hopper's equity-clause scheme, Newmark did not prove that such a breach was incurable.

---

[3] The district court clearly erred by finding that Sonic's interest in Brevard ceased on October 23, 2017, (J.A. 2216), because Capps was continuing to pitch the property to Sonic for several more months, and even after the Holder agreement was signed.

At trial, the only evidence of incurability offered for any of the purported breaches of contract was the testimony of Newmark CEO Barry Gosin. (J.A. 2151) (citing Newmark's evidence of incurability as (J.A. 1523-25)). Presumably, this is what the district court relied on, since the court failed to explain curability. *See* (J.A. 2248-49). Gosin's arguments for incurability were unsound.

First, Gosin argued that it was improper for the three men to take equity for themselves, when that value should have gone to Newmark, or else provide equity to Newmark. (J.A. 1524-25). They should have gotten approval of legal counsel before doing so, said Gosin. (J.A. 1524). Second, Gosin explained that getting equity for the sale of a building while representing potential tenants was a potential conflict of interest. (J.A. 1524-25).

But even if Capps knew about Hopper's promotion of the equity clauses and even if that were a material breach, it could not have been an *incurable* one because Newmark gave both Senter and Hopper the opportunity to cure the same (or worse) breach. (J.A. 2373-74). To cure, Hopper and Senter were required prospectively to send all brokerage agreements to Newmark's legal department for review before sending

them to clients. (J.A. 2373-74). Newmark even testified that Senter—the tagalong to Hopper's scheme—"absolutely" deserved no more than a warning put in his HR file. (J.A. 1490).

When Newmark began its investigation into the equity clauses, it asked Capps to send all draft brokerage agreements to in-house counsel for review. (J.A. 3095-96). Capps complied. (J.A. 1275-77). In-house counsel just ignored Capps's requests for review. (J.A. 1319-20). Despite Capps's compliance with the cure request, Newmark terminate him for cause anyway.

Gosin's efforts at trial to distinguish the treatment of the three brokers showed a lack of understanding of the undisputed facts. Gosin's subordinates had failed to tell him that Capps had said that "it would be wrong to take a personal equity interest in a deal." (J.A. 1546; *see* J.A. 1497-98). Capps's statement to Newmark during the investigation was "unequivocal" about the wrongfulness of the equity clauses. (J.A. 1595-96). Gosin testified that it would've been "highly unlikely" for Capps to be terminated if he had acknowledged the wrongful nature of the equity clauses in general. (J.A. 1547). Gosin also believed that Senter had asked Hopper whether the agreement had been sent to legal counsel for

review. (J.A. 1552). But Newmark's disciplinary letter to Senter stated that Senter never asked that question. (J.A. 2374). And, even more contradictory, Hopper told Newmark that he had told Senter that "time is of the essence" and that Hopper and Senter could "talk to legal after we get signed up." (J.A. 2643). Given the contradictions in Newmark's evidence, it's little surprise that Gosin couldn't keep up with Newmark's incoherent tale.

Finally, even taking Hopper's testimony as true, as the district court did, shows that no harm to Newmark was intended by the equity clauses. Hopper told Newmark during its investigation—and told the district court during trial—that he never intended for the equity clauses to cut out Newmark from a share of any commission. Hopper did not understand that the language as drafted would have that effect. (J.A. 1414, 1422, 1821, 1825, 1850-51). And Capps assumed that Hopper intended any equity from the deal to go to Newmark. (J.A. 2340).

Newmark's evidence simply did not add up to incurability under governing New York law. Even if Capps had participated in Hopper's promotion of the equity clauses, that participation could be no worse than the conduct of Hopper or Senter, whose conduct was curable and forgiven.

Nor did Gosin suggest that Capps's statements during the investigation had any relevance to curability. After all, an employee's denial of his employer's allegation of wrongdoing cannot automatically vitiate a notice-and-cure requirement, reducing the dispute to a question of materiality. That would neuter the curability requirement, counter to the "clear New York rule" for enforcing notice-and-cure requirements. *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989).

\* \* \*

For any of these reasons, the trial court's judgment on Capps's contract claim should be reversed. Reversal on this claim likewise requires reversal on Capps's claim for breach of the covenant of good faith and fair dealing: the district court entered judgment for Newmark on that claim because it had found for Newmark on the regular breach of contract claim. (J.A. 2248).

## III. The District Court Erred in Dismissing Capps's Other Claims on the Pleadings.

At the Rule 12 stage, the district court erroneously dismissed other claims by Capps against Newmark. The court's ruling on Newmark's

Rule 12(b)(6) motion is reviewed de novo. *E. Shore Markets, Inc. v. J.D. Assocs. LP*, 213 F.3d 175, 180 (4th Cir. 2000).

## A. The district court erred by refusing to make an *Erie* guess.

Because Capps and Katz were partners, they owed each other fiduciary duties. When their relationship fell apart, they began litigating. In the process, Newmark sided with Katz and aided him in breaching the fiduciary duties he owed to Capps. Capps then sued Newmark for aiding and abetting Katz's breach of his fiduciary duties.

The district court dismissed that claim because the Supreme Court of North Carolina had not directly permitted such liability. Essentially, the district court refused to determine how the Supreme Court of North Carolina would answer this question.

When a federal district court sits in diversity, "[t]he principles of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)," require the federal court to enforce state-created rights "in a manner such that litigation of state-based rights in federal court does not yield results materially different from those attained in the state courts." *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 (4th Cir. 1992). In so doing, the federal court "has a duty to apply the operative state law as would the highest court of the

50

state in which the suit was brought." *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992).

The district court erred by flouting that duty. The court determined that there was confusion and conflict among opinions at the North Carolina Court of Appeals and federal district courts for whether the state imputes aiding-and-abetting liability for breaches of fiduciary duties. (J.A. 153-54).

It was error for the district court to use apparent lower-court confusion as an excuse to avoid predicting how the Supreme Court of North Carolina would answer the question. *Erie* does not permit a federal court to "abstain from finding a development in the law of a state merely because the precise point has never been decided by its highest court." *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951). A federal court's duty "is to decide, not avoid, the question." *Daily v. Parker*, 152 F.2d 174, 177 (7th Cir. 1945). Otherwise, there would never be any *Erie* guesses.

Instead, when a state's highest court "has spoken neither directly nor indirectly on the particular issue," federal courts must "predict" how the state's highest court "would rule if presented with the issue." *Priv.*

*Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).  That educated guess turns on the consideration of several sources, including the opinions of "the state's intermediate appellate court," as well as "restatements of the law, treatises, and well considered dicta."  *Id.*  The court may also consider the decisions of other federal courts or federal-law analogies.  19 Charles A. Wright et al., *Federal Practice and Procedure* § 4507 (3d ed. Westlaw).

The North Carolina Court of Appeals has issued conflicting decisions on liability for aiding and abetting a breach of fiduciary duty.  The Court of Appeals first recognized the claim in *Blow v. Shaughnessy*, 364 S.E.2d 444, 447 (N.C. Ct. App. 1988).  In its discussion, the *Blow* court relied on section 876 of the Second Restatement of Torts as a persuasive source of such liability, and noted that the Supreme Court of North Carolina had relied on the Restatement section in *Boykin v. Bennett*, 118 S.E.2d 12, 16 (N.C. 1961).  *Blow*, 364 S.E.2d at 447.  The *Blow* court also considered a decision of the Supreme Court of the United States, decided in the securities context, as a reason for recognizing such liability.  *Id.*

Moreover, section 876 of the Second Restatement of Torts acknowledges the existence of aiding-and-abetting liability for the tortious misconduct of another, so long as the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876 (Am. Law Inst. 1979). The principle is simply illustrated: "A and B participate in a riot in which B, although throwing no rocks himself, encourages A to throw rocks. One of the rocks strikes C, a bystander. B is subject to liability to C." *Id.* illus. 4.

This Restatement section has been applied by the North Carolina Supreme Court and repeatedly relied on by the state's intermediate appellate court. *Boykin*, 118 S.E.2d at 16; *Wilcox v. City of Asheville*, 730 S.E.2d 226, 235-36 (N.C. Ct. App. 2012); *Stetser v. TAP Pharm. Prod., Inc.*, 598 S.E.2d 570, 583 (N.C. Ct. App. 2004); *McMillan ex rel. McMillan v. Mahoney*, 393 S.E.2d 298, 300 (N.C. Ct. App. 1990).

*Blow*'s recognition of aiding and abetting liability also made sense. North Carolina recognizes new forms of liability when it advances the state's public policy to do so. *Nicholson v. Hugh Chatham Mem'l Hosp., Inc.*, 266 S.E.2d 818, 821-22 (N.C. 1980). And North Carolina's policy is

to strictly enforce the duties of fiduciaries. *King v. Bryant*, 795 S.E.2d 340, 349 (N.C. 2017). It is hard to imagine any good reason to immunize a person who knowingly helps a fiduciary breach his duties.

North Carolina also recognizes new forms of liability that are in the mainstream of American jurisdictions. *See Coman v. Thomas Mfg. Co.*, 381 S.E.2d 445, 448 (N.C. 1989) (recognizing liability for wrongful discharge after surveying the law in other states); *Nicholson*, 266 S.E.2d at 823 (recognizing liability for loss of consortium after surveying the law in other states); *Jackson v. Bumgardner*, 347 S.E.2d 743, 747-48 (N.C. 1986) (recognizing liability for wrongful conception after surveying the law in other states). And most states have adopted the Restatement's position on aiding-and-abetting liability. *In re Houston Reg'l Sports Network, L.P.*, 547 B.R. 717, 759 (Bankr. S.D. Tex. 2016) ("At least 28 states have held that a claim for aiding and abetting under § 876(b) exists.").

The Restatement section is also similar to a form of liability that North Carolina indisputably recognizes: tortious interference with contract. That cause of action requires proof of a duty imposed by contract, the defendant-interferer's knowledge of that duty, and conduct inducing the party not to perform his contractual duties. *See generally United*

*Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988). The same policy considerations drive liability for both claims.

*Blow* should have been the end of it. *See In re Civil Penalty*, 379 S.E.2d 30, 37 (N.C. 1989) (holding that panels of the Court of Appeals may not overrule the decisions of earlier panels). Yet a different panel of the North Carolina Court of Appeals suggested in 2014 that *Blow **may*** no longer be good law because it had relied, in part, on a decision of the United States Supreme Court that had been abrogated. *Bottom v. Bailey*, 767 S.E.2d 883, 889 (N.C. Ct. App. 2014). But the federal authority referenced by *Bottom* was merely mentioned in passing in *Blow*; it was not critical to *Blow*'s reasoning, which was tethered to the Restatement and *Boykin*. Even so, *Bottom* ultimately took no position on whether the state recognized liability for aiding and abetting breach of fiduciary duty. *Id.* at 889 ("[W]e need not address whether a claim for aiding and abetting a breach of fiduciary duty exists at law in North Carolina . . . .").

Since *Bottom*, courts have said that the law is unsettled. The most thorough survey of the conflicting law is set out in a decision from a North Carolina bankruptcy court, *In re Am. Ambulette & Ambulance Serv., Inc.*, 560 B.R. 256, 265 (Bankr. E.D.N.C. 2016). After engaging in a deeper

analysis of the issue than that found in anywhere else, the court made an *Erie* prediction that "the North Carolina Supreme Court would recognize a claim for aiding and abetting breach of fiduciary duty." *Id.* at 267. And as another court has reasoned, the "inconsistent" decisions of the North Carolina Court of Appeals should be set aside, "[g]iven the North Carolina Supreme Court's adoption of the Restatement standard in *Boykin*." *In re N.C. & Va. Warranty Co., Inc.*, 594 B.R. 316, 356-57 (Bankr. M.D.N.C. 2018).

Thus, the district court misconstrued existing North Carolina law. But more fundamentally, it erroneously abstained from making an *Erie* prediction in the first place. There was no need for that reluctance because recognizing liability for aiding and abetting the breach of another's fiduciary duty is not a shocking extension of liability, nor really an independent tort. As the Seventh Circuit has explained, "it is apparent that one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud, in just the same way that the criminal law treats an aider and abettor as a principal." *E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623-24 (7th Cir. 2000) (citation omitted). Applying that principle, another panel of the Seventh Circuit predicted

that Illinois would impose liability for aiding and abetting a breach of fiduciary duty, whether framed as an "independent tort" or simply a theory of imputing liability for the underlying tort. *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006).

Other courts have reached the same conclusion. Federal courts sitting in diversity have repeatedly predicted that state courts would impose liability for aiding and abetting a breach of fiduciary duty. *See, e.g.,* *Invest Almaz v. Temple-Inland Forest Prods. Corp.*, 243 F.3d 57, 82-83 (1st Cir. 2001); *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 532-33 (6th Cir. 2000); *Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1182 (10th Cir. 1989); *In re Felt Mfg. Co.*, 371 B.R. 589, 615 (Bankr. D.N.H. 2007); *Adelphia Recovery Tr. v. Bank of Am.*, 390 B.R. 64, 78 (S.D.N.Y. 2008); *Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178, 1189 (D. Utah 2007).

To be fair, some federal courts have guessed that some other states would not recognize this type of liability. That was the guess that the Eleventh Circuit made under Georgia law, for example. *See In re Munford, Inc.*, 98 F.3d 604, 613 (11th Cir. 1996). That turned out to be a bad

guess, though, because Georgia later recognized such liability. *See Cottrell v. Smith*, 788 S.E.2d 772, 786 (Ga. 2016); *Insight Tech., Inc. v. FreightCheck, LLC*, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006). To avoid embarrassment, the safer path for the Eleventh Circuit would have been to follow the Restatement and American mainstream.

Below, Newmark sought dismissal of this claim on the sole ground that North Carolina does not recognize such liability. (J.A. 108). And that was the sole reason for the district court's dismissal. (J.A. 154). Under *Erie*, North Carolina would recognize such liability and join the legal mainstream. The district court erred by holding otherwise.

## B. The district court erred by dismissing Capps's claim for tortious interference with contract.

The district court also erred by dismissing, at the pleading stage, Capps's claim for tortious interference. Capps and Katz had a contractual relationship in the form of the CTG partnership. Newmark interfered with that relationship during the winding-up phase, after its dissolution but before termination. The district court erred by holding that it is legally impossible to interfere with a partnership during wind up.

Among other things, a plaintiff states a claim for intentional interference with contract when he pleads that the "defendant intentionally

induce[d] a third person not to perform the contract." *Krawiec v. Manly*, 811 S.E.2d 542, 546 (N.C. 2018) (quoting *United Labs.*, 370 S.E.2d at 387). Here, the underlying contract was the CTG partnership between Capps and Katz. (J.A. 74). All partnerships are contractual. *See Potter v. Homestead Pres. Ass'n*, 412 S.E.2d 1, 5 (N.C. 1992).

The sole basis for the district court's dismissal was that Capps had not pleaded an underlying contract because Katz had dissolved the partnership when Newmark interfered. (J.A. 157-58). The court reasoned that dissolution occurs as soon as any partner expresses a desire to dissolve the partnership. (J.A. 156-57). Although that's true, *see* N.C. Gen. Stat. § 59-61(1)(b), dissolution does not terminate a partnership. Instead, "[o]n dissolution the partnership is ***not terminated***, but continues until the winding up of partnership affairs is completed," *id.* § 59-60 (emphasis added). After dissolution, the partners continue to have rights and obligations against each other during wind up. *Id.* §§ 59-67 to -70; *Simmons v. Quick-Stop Food Mart, Inc.*, 307 N.C. 33, 40, 296 S.E.2d 275, 280 (1982) ("Winding up generally involves the settling of accounts among partners . . . ."). And "at the date of dissolution, a partner accrues

the right to an account of his interest 'as against the winding up part-ners.'" *Sander v. O'Dwyer*, No. COA06-631, 2007 WL 2034089, at *3 (N.C. Ct. App. 2007) (quoting N.C. Gen. Stat. § 59-73).

Capps alleged that Newmark interfered with the partnership during wind up, at a time when the partnership had been *dissolved* but not yet *terminated*. As the complaint alleged, Newmark induced and helped Katz breach his obligations to wind up the partnership, especially the partnership's pending deals and outstanding commissions. (J.A. 64-66, 72). At trial, Newmark admitted that CTG was not terminated at dissolution but continued until it was wound up. (J.A. 1893).

Those allegations sufficiently pleaded that Newmark tortiously interfered with the partnership. The district court erred in dismissing the claim.

### C. The district court erred by dismissing Capps's claim for civil conspiracy.

Capps's complaint also alleged that Newmark conspired to divert CTG's business to Katz and Harris and away from Capps, in breach of the fiduciary duties that Katz and Harris owed Capps. (J.A. 75). The district court erred by nullifying the law of civil conspiracy. After the district court dismissed all of Capps's tort claims against Newmark, it

reasoned that there is no conspiracy liability for a breach of contract (the remaining claim), and dismissed the civil conspiracy as well. (J.A. 159-60). That was wrong for two reasons.

First, as this brief explains, Capps did sufficiently plead other, independent claims.

Second, Capps pleaded that Katz and Harris breached their fiduciary duties to Capps, Newmark agreed with them to achieve that unlawful goal, and at least one of these co-conspirators took unlawful acts in furtherance of that goal. (J.A. 72, 75). The district court, however, required Capps to plead some other tort claim directly against Newmark. But if the law required an independent tort against the defendant, then there would no reason for conspiracy liability.

Civil conspiracy liability is a form of imputed liability. Imputation of liability for all co-conspirators applies when there is "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 666 S.E.2d 107, 115 (N.C. 2008). A conspiracy is "an agreement between two or more individ-

uals to do an unlawful act or to do a lawful act in an unlawful way." *Dickens v. Puryear*, 276 S.E.2d 325, 337 (N.C. 1981) (quoting *State v. Dalton*, 83 S.E. 693, 694 (N.C. 1914)).

Although liability for civil conspiracy requires some overt act in furtherance of the conspiracy, the defendant need not be the person who committed the act. Nor is it "necessary that all [co-conspirators] be joined" in the action because "an action [for civil conspiracy] may be maintained against only one [co-conspirator]." *Burns v. Gulf Oil Corp.*, 98 S.E.2d 339, 344 (N.C. 1957). Likewise, it does not matter if other co-conspirators are dismissed, *id.*, since conspiracy liability is "joint and several," *Muse v. Morrison*, 66 S.E.2d 783, 785 (N.C. 1951). Once a plaintiff shows that "at least one conspirator" committed an act in furtherance of the conspiracy, "all of the conspirators are jointly and severally liable for the act of any one of them done in furtherance of the agreement." *Dalton v. Camp*, 531 S.E.2d 258, 267 (N.C. Ct. App. 2000), *rev'd in part on other grounds*, 548 S.E.2d 704 (N.C. 2001); *accord Burton v. Dixon*, 131 S.E.2d 27, 30 (N.C. 1963). When the defendant is a conspirator who did not commit any overt act, his liability mirrors "respondeat superior." *Burns*, 98 S.E.2d at 343.

The district court applied none of these principles. Even if all tort claims against Newmark were dismissed, Newmark still had imputed liability for any acts furthering the conspiracy.

### D.  The district court erred by dismissing Capps's unfair-practices claim.

In the original complaint, Capps alleged that Newmark violated N.C. Gen. Stat. § 75-1.1. That statute prohibits unfair business that are "in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). The district court erred by holding that Capps had not sufficiently pleaded this commerce element.

The "statutory definition of commerce is expansive." *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 492 (N.C. 1991). Although an "employer-employee" relationship is generally not in "commerce," *id.*, an employer's misconduct is in commerce if it "involve[s] egregious activities outside the scope of" employment obligations, *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 714 S.E.2d 162, 167-68 (N.C. Ct. App. 2011). Likewise, the commerce element is met "where fiduciary duties are owed among the parties and in cases that involve self-dealing conduct." *Hilco Transp., Inc. v. Atkins*, No. 14-CVS-8677, 2016 WL 197133, at *8 (N.C. Bus. Ct. Jan. 15, 2016). Courts will not dismiss on

the commerce prong if the employer's acts "involve 'outside businesses,' 'distinct corporate entities,' or the interruption of a 'commercial relationship' between two market participants." *Urquhart v. Trenkelbach*, No. 15 CVS 3055, 2017 WL 536318, at *4 (N.C. Bus. Ct. Feb. 8, 2017) (quoting *Alexander v. Alexander*, 792 S.E.2d 901, 906 (N.C. Ct. App. 2016)).

Even though Capps was an independent contractor rather than an employee, and CTG operated as a line of business within Newmark, the district court held that the misconduct alleged was too internal to Newmark to be "in or affecting commerce." (J.A. 162). The court failed to recognize that Newmark's predicate misconduct for the claim was not internal to Newmark's business. Rather, Newmark interrupted the relationship between different market participants (Capps, Katz, and their partnership), thereby impacting the marketplace.

When Capps and Katz joined Newmark, they joined as partners jointly managing an autonomous business. (J.A. 50-52, 77). Capps and Katz paid out of their own pockets for the salaries of CTG's employees, technology, and consultants. (J.A. 54). The independent nature of the business was intended to give Capps and Katz leverage if they wanted to terminate their contracts prematurely. (J.A. 54).

Newmark's misconduct was in or affecting commerce when it intermeddled in the affairs of CTG. After Katz dissolved CTG, Newmark took it on itself to "appoint[] someone internally to oversee and mediate the dissolution." (J.A. 61). When Newmark no longer wanted to deal with Capps, it suddenly terminated him for cause. *Id.* (J.A. 67-68). That termination has destroyed Capps's ability to compete in the marketplace due to the "irreparable reputational and professional harm to Capps with his clients, colleagues, consultants and peers." (J.A. 68).

Newmark's misconduct was not internal to Newmark, but acted on several different entities: the partnership, Katz, Capps, and Capps's LLC (which actually employed Capps). Indeed, the district court dismissed Capps's defamation claim against Newmark based on Katz's false statements because Newmark and Katz are *distinct* and bound only by an independent-contractor relationship. (J.A. 159) ("Newmark would not be liable for defamatory statements made by Katz, who is an independent contractor.").

Ultimately, Capps alleged that Newmark's conduct was in or affecting commerce, including "sufficient factual matter (taken as true) to suggest a cognizable cause of action." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (cleaned up).

## REQUEST FOR REASSIGNMENT ON REMAND

If this Court agrees with Capps about the trial errors, Capps respectfully requests that the case be reassigned to a different district judge on remand.

After a bench trial involving substantial credibility determinations, a remand for a new trial, if the case is again tried to the court, is the "preferable course, since it avoids any rub-off of earlier error." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc). To be clear, Capps *is not* accusing the prior district judge of any sort of judicial misconduct. Rather, this request stems from the very human observation that the "original judge," like other people, may "have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected." *United States v. Nicholson*, 611 F.3d 191, 217 (4th Cir. 2010); *see also United States v. Lopez-Magallon*, 738 F. App'x 577, 578 (9th Cir. 2018)

(conditionally reassigning after appeal from bench trial, should appellant again elect to have a bench trial).  Such is the case here, where the district court made detailed findings, and "'cannot reasonably be expected to erase the earlier impressions from [her] mind'—or, indeed, 'may tend to lean over backwards or overreact in an effort to be fair and impartial.'" *Nicholson*, 611 F.3d at 218.  "A new fact-finder," however, "would not labor under any such handicap." *Robin*, 553 F.2d at 10.

The Seventh Circuit, in fact, has codified this proposal into an across-the-board rule.  Unless the Seventh Circuit directs otherwise, "[w]henever a case tried in a district court is remanded by this court for a new trial, it shall be reassigned by the district court for trial before a judge other than the judge who heard the prior trial." 7th Cir. R. 36.  Although this Court has not adopted that rule, it may order the same result.  28 U.S.C. § 2106; *E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*, 564 F. App'x 710, 716 (4th Cir. 2014).

Doing so here would serve the "salutary" purpose of protecting the original district judge from any accusation of implicit bias, accidental reliance on evidence from prior trial, or prejudging of the evidence.  This outcome is best "'for the judge's sake and the appearance of justice . . .

especially as it minimizes even a suspicion of partiality.'" *United States v. Guglielmi*, 929 F.2d 1001, 1007 (4th Cir. 1991) (quoting *Robin*, 553 F.2d at 9-10).

## CONCLUSION

For these reasons, Capps requests that the judgment be reversed and the case be remanded with these instructions:

- Newmark is liable to Capps on Capps's breach of contract claim, and the parties shall proceed to trial on Capps's damages for this claim;

- Accordingly, Newmark's breach of contract counterclaim must be dismissed with prejudice; and

- Capps's claims for aiding and abetting breach of fiduciary duty, tortious interference with contract, civil conspiracy, and violation of N.C. Gen. Stat. § 75-1.1 are reinstated for further proceedings.

# STATEMENT REGARDING ORAL ARGUMENT

This Circuit has virtually no case law on the basic issues arising from for-cause contractual terminations, whether in the context of employment or business-to-business contracts. Although this is a diversity case, with the contract claim governed by New York law, that body of law is fairly representative of the law across the nation on for-cause termination. This case—with a moderately-sized record after a full trial—provides an excellent opportunity for this Circuit to give guidance to district courts on how to review claims of for-cause termination, and at least determine what questions a district court should ask, even when applying the law of another jurisdiction.

In addition, there is a split of authority among the circuit courts over how and whether to recognize liability for aiding and abetting. This Court should provide its own guidance for how district courts should consider aiding and abetting liability under state law. At the very least, this Court could confirm that district courts must make *Erie* guesses when the case calls for it—or seek certification to the highest court in the applicable state, where available.

For either of these reasons, or for the other issues presented in this appeal, oral argument would help the Court produce an opinion.

/s/ Troy D. Shelton
Troy D. Shelton
Matthew Nis Leerberg
FOX ROTHSCHILD LLP
P.O. Box 27525
Raleigh, NC 27611
(919) 755-8700

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

      this document contains <u>12,983</u> words.

2.     This document complies with the typeface requirements because:

      This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Century Schoolbook</u>.

Dated: June 28, 2021      Respectfully Submitted,

/s/ Troy D. Shelton
Troy D. Shelton
Matthew Nis Leerberg
N.C. State. Bar No. 35406
FOX ROTHSCHILD, LLP
434 Fayetteville Street
Suite 2800 (27601)
P.O. Box 27525
Raleigh, North Carolina 27611
Telephone: (919) 755-8700
Facsimile: (919) 755-8800

*Counsel for Appellant*