In The

# United States Court Of Appeals
### For The Fourth Circuit

## TIMOTHY CAPPS,

*Plaintiff - Appellant,*

v.

## NEWMARK SOUTHERN REGION, LLC;
## NEWMARK & COMPANY REAL ESTATE, INC.,

*Defendants - Appellees,*

and

### DOES 1-25,

*Defendant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH**

_____

## BRIEF OF APPELLEES

_____

| | |
|---|---|
| **Jonathan D. Sasser** | **David A. Paul** |
| **Thomas H. Segars** | **CANTOR FITZGERALD SECURITIES** |
| **ELLIS & WINTERS, LLP** | **110 East 59th Street** |
| **4131 Parklake Avenue** | **7th Floor** |
| **P. O. Box 33550** | **New York, NY 10022** |
| **Raleigh, NC 27636** | **(212) 610-2298** |
| **(919) 865-7002** | |

*Counsel for Appellees*                    *Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 21-1196            Caption: Timothy Capps v. Newmark Southern Region, LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Newmark Southern Region, LLC
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.  Does party/amicus have any parent corporations?  ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Newmark Partners, L.P. is parent; Newmark Holdings, L.P. and Newmark Group, Inc. are grandparents.


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _Jonathan D. Sasser_____    Date: ___03/08/2021_____

Counsel for: _Newmark Southern Region, LLC_____

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1196          Caption: Timothy Capps v. Newmark Southern Region, LLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Newmark & Company Real Estate Inc.
(name of party/amicus)

_____

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                                 ☑ YES ☐ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     Parent: Newmark Group, Inc.
     Grandparents: Public Stockholders and Cantor Fitzgerald, L.P.
     Great Grandparent: CF Group Management, Inc.(as Managing General Partner) and Other
     Partners

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                                     ☑ YES ☐ NO
     If yes, identify all such owners:
     Newmark Group, Inc.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: _Jonathan D. Sasser_____     Date: _____3/16/2021_____

Counsel for: _Newmark & Company Real Estate Inc_

- 2 -

[ Print to PDF for Filing ]

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ...................................................................................iv

INTRODUCTION ...............................................................................................1

COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..........2

COUNTERSTATEMENT OF THE FACTS ...........................................................2

    A.    Capps Joins Newmark and Executes Certain Agreements ..................2

    B.    The CTG Team Unravels Due to Infighting and Capps' Abusive Behavior ..................................................................................3

    C.    Newmark's Human Resources Department Investigates the CTG Team and Warns Capps About his Misconduct..........................4

    D.    Capps Rejects Newmark's Efforts to Make Amends...........................5

    E.    Newmark's Counsel Discovers Capps' Attempts to Take a Personal Ownership Stake in a Property...............................................6

    F.    Newmark Terminates the Agreement for Cause.................................10

SUMMARY OF THE ARGUMENT ....................................................................11

STANDARDS OF REVIEW ...............................................................................13

ARGUMENT ....................................................................................................15

    I.    The District Court Properly Required Capps to Prove Performance Under the Agreement.......................................................15

    II.    The District Court Properly Found Capps Materially and Incurably Breached the Agreement.....................................................18

        A.    The District Court Properly Concluded Capps' Involvement in the "Equity Clause Scheme" Was Material and Justified "for Cause" Termination......................20

1.    The Record Is Clear that Capps Endorsed the Equity Clause Scheme .......................................22

2.    Capps Intended to Pursue a Deal with the Potential Clients to Whom the Equity Clause Provisions Were Proposed.................................................24

3.    Hopper Did Not Improperly Acquire Information about the Trial Prior to Testifying .................................27

B.    The District Court Properly Concluded Capps' Involvement with the Equity Clause Scheme Was an Incurable Breach ........................................................27

1.    This Court Should Review the District Court's "Curability Analysis" for Clear Error.............................28

2.    Capps' Misconduct Was Not Curable ...........................30

C.    The Court Properly Found Capps' Unprofessional Behavior Was a Material and Incurable Breach of Contract ........................................................................34

1.    The Court's Findings are Consistent with New York Law ......................................................................35

2.    Newmark Did Not Waive Its Right to Terminate Capps for his Unprofessional Behavior..........................39

III.    The District Court Correctly Dismissed the Aiding and Abetting Claim at the Pleadings Stage .................................41

A.    The District Court "Predicted" that the North Carolina Supreme Court Would Not Recognize a Cause of Action for Aiding and Abetting Breach of Fiduciary Duty.................41

B.    North Carolina Courts Have Made Clear that the North Carolina Supreme Court Would Not Recognize This Cause of Action.........................................................................41

IV.    The District Court Correctly Dismissed the Tortious Interference with Contract Claim ........................................................ 45

V.    The District Court Correctly Dismissed the Civil Conspiracy Claim ................................................................................................. 48

VI.    The District Court Correctly Dismissed the Unfair Business Practices Claim ................................................................................... 50

THIS COURT SHOULD DENY CAPPS' REQUEST FOR REASSIGNMENT ......................................................................................... 52

CONCLUSION ......................................................................................... 54

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Agra, Gill & Duffus, Inc. v. Benson,*
    920 F.2d 1173 (4th Cir. 1990) ....................................26

*Alesayi Beverage Corp. v. Canada Dry Corp.,*
    947 F. Supp. 658 (S.D.N.Y. 1996) .....................20, 33, 38

*Anacapa Tech., Inc. v. ADC Telecommunications, Inc.,*
    241 F. Supp. 2d 1016 (D. Minn. 2002) ........................31

*Andrews v. Am.'s Living Ctrs.,*
    827 F.3d 306 (4th Cir. 2016) ....................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................47

*Assicurazioni Generali, S.p.A. v. Neil,*
    160 F.3d 997 (4th Cir. 1998) ....................................42

*BDM Invs. v. Lenhil, Inc.,*
    826 S.E.2d 746 (N.C. Ct. App. 2019)...........................43

*Beach Mart, Inc. v. L&L Wings, Inc.,*
    784 F. App'x 118 (4th Cir. 2019)................................53

*Belk v. Charlotte-Mecklenburg Bd. of Educ.,*
    269 F.3d 305 (4th Cir. 2001) ....................................18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................14

*Bigda v. Fischbach Corp.,*
    849 F. Supp. 895 (S.D.N.Y. 1994), *aff'd,*
    122 F.3d 1055 (2d Cir. 1997) ...................................20

*Blow v. Shaughnessy,*
    364 S.E.2d 444 (N.C. Ct. App. 1988)......................42, 43

*Bottom v. Bailey*,
  767 S.E.2d 883 (N.C. Ct. App. 2014)......................................................41, 43

*Boykin v. Bennett*,
  118 S.E.2d 12 (N.C. 1961) ...................................................................43, 44

*Burnley v. Norwood*,
  No. 3:10CV264-HEH, 2010 WL 3063779 (E.D. Va. Aug. 4, 2010)...........47

*Byrd v. Hopson*,
  265 F. Supp. 2d 594 (W.D.N.C. 2003).........................................................49

*Catawba Indian Tribe of S.C. v. City of Rock Hill, SC*,
  501 F.3d 368 (4th Cir. 2007) ........................................................................30

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
  511 U.S. 164 (1994)......................................................................................42

*Cochran v. Morris*,
  73 F.3d 1310 (4th Cir. 1996) ........................................................................19

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003).........................................................................................15

*Ehrenhaus v. Baker*,
  717 S.E.2d 9 (N.C. Ct. App. 2011)...............................................................43

*Equinor USA Onshore Props. Inc. v. Pine Res., LLC*,
  917 F.3d 807 (4th Cir. 2019) ........................................................................14

*Erie Railroad Co. v. Tompkins*,
  304 U.S. 64 (1938).........................................................................................41

*Esposito v. Talbert & Bright, Inc.*,
  641 S.E.2d 695 (N.C. Ct. App. 2007).....................................................45, 46

*Evergreen Int'l, S.A. v. Norfolk Dredging Co.*,
  531 F.3d 302 (4th Cir. 2008) ........................................................................14

*Felsen v. Sol Cafe Mfg. Corp.*,
  249 N.E.2d 459 (N.Y. 1969) .........................................................................16

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*,
    865 F.2d 513 (2d Cir. 1989) .......................................................................32

*Francis v. Giacomelli*,
    588 F.3d 186 (4th Cir. 2009) .....................................................................47

*Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*,
    No. 13-CV-0520, 2013 WL 1968371 (E.D.N.Y. May 10, 2013), *aff'd*,
    756 F.3d 204 (2d Cir. 2014) ................................................................36, 37

*Glocker v. W.R. Grace & Co.*,
    68 F.3d 460 (4th Cir. 1995) .......................................................................52

*Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*,
    No. 11 CIV. 3130 (DLC), 2012 WL 4049955 (S.D.N.Y. Sept. 14, 2012) ...35

*HAJMM Co. v. House of Raeford Farms, Inc.*,
    403 S.E.2d 483 (N.C. Ct. App. 1991).........................................................50

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) .......................................................................16

*Helton v. AT & T Inc.*,
    709 F.3d 343 (4th Cir. 2013) .....................................................................14

*In re 4Kids Entm't, Inc.*,
    463 B.R. 610 (Bankr. S.D.N.Y. 2011) .......................................................38

*In re Under Seal*,
    749 F.3d 276 (4th Cir. 2014) ...............................................................19, 35

*Iodice v. United States*,
    289 F.3d 270 (4th Cir. 2002) .....................................................................42

*Kalus v. Prime Care Physicians, P.C.*,
    799 N.Y.S. 2d 115 (2d Dep't 2005) ...........................................................38

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) .....................................................................15

*Krawiec v. Manly*,
    370 N.C. 602 (2018) ...................................................................48

*Land v. Land*,
    729 S.E.2d 731 (N.C. Ct. App. 2012)..........................................43

*Lee v. Certainteed Corp.*,
    123 F. Supp. 3d 780 (E.D.N.C. 2015) ..................................... 43-44

*L.K. Comstock & Co. v. United Engineers & Constructors Inc.*,
    880 F.2d 219 (9th Cir. 1989) .......................................................29

*Loray Master Tenant, LLC. v. Foss N.C. Mill Credit 2014 Fund I, LLC*,
    2021 WL 661910 (N.C. Super. Feb. 18, 2021) ............................48

*Manpower Inc. v. Mason*,
    377 F. Supp. 2d 672 (E.D. Wis. 2005) ........................................30

*MBIA Ins. Corp. v. Patriarch Partners VIII*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012) .........................................40

*McDonough Power Equip., Inc. v. Greenwood*,
    464 U.S. 548 (1984).....................................................................15

*McMillan ex rel. McMillan v. Mahoney*,
    393 S.E.2d 298 (N.C. Ct. App. 1990)..........................................44

*Meeker v. Edmundson*,
    415 F.3d 317 (4th Cir. 2005) .......................................................17

*Moore v. Nationwide Mut. Ins.*,
    136 F. Supp. 2d 518 (M.D.N.C. 2001) ........................................46

*Morris v. Bland*,
    No. 5:12-CV-3177-RMG, 2014 WL 12637911 (D.S.C. Dec. 31, 2014) ......26

*Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*,
    584 P.2d 968 (Wash. Ct. App. 1978) ..........................................29

*Nationwide Mut. Ins. Co. v. United Comput. Cap. Corp.*,
    No. 16340, 1994 WL 78640 (Ohio Ct. App. Mar. 16, 1994).......29

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ............................................................19, 30, 35

*Philips v. Pitt Cty. Mem'l Hosp.*,
572 F.3d 176 (4th Cir. 2009) .......................................................................14

*Piraino Bros., LLC v. Atlantic Fin. Grp., Inc.*,
712 S.E.2d 328 (N.C. Ct. App. 2011)...........................................................49

*Pisani v. Westchester Cty. Health Care Corp.*,
424 F. Supp. 2d 710 (S.D.N.Y. 2006) ..................................................... 15-16

*Refinemet Int'l Co. v. Eastbourne N.V.*,
815 F. Supp. 738 (S.D.N.Y. 1993), *aff'd*,
25 F.3d 105 (2d Cir. 1994) ..................................................... 18-19, 35

*Sapuppo v. Allstate Floridian Ins. Co.*,
739 F.3d 678 (11th Cir. 2014) .....................................................................19

*Sara Lee Corp. v. Carter*,
351 N.C. 27 (1999) ......................................................................................51

*Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*,
377 F.3d 408 (4th Cir. 2004) .......................................................................29

*Seven-Up Bottling Co. (Bangkok) v. PepsiCo.*,
686 F. Supp. 1015 (S.D.N.Y. 1988) .............................................................40

*Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*,
885 F.3d 271 (4th Cir. 2018) .......................................................................28

*Southland Corp. v. Froelich*,
41 F. Supp. 2d 227 (E.D.N.Y. 1999) .....................................................20, 31

*Southland Corp. v. Mir*,
748 F. Supp. 969 (E.D.N.Y. 1990) ..............................................................31

*Spires v. Sch.*,
271 F. Supp. 3d 795 (D.S.C. 2017) .............................................................28

*State ex rel. Cooper v. Ridgeway Brands Mfg., LLC,*
    811 S.E.2d 542 (N.C. Ct. App. 2008)............................................................48

*Stetser v. TAP Pharm. Prod., Inc.,*
    598 S.E.2d 570 (N.C. Ct. App. 2004)............................................................44

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
    988 F.3d 690 (4th Cir. 2021) ................................................................53, 54

*Stolfa v. Arnold Sales Co., Inc.,*
    No. 06-CV-2085 (JS)(WDW), 2007 WL 9710388
    (E.D.N.Y. Mar. 30, 2007)............................................................................35

*Superior Performers, Inc. v. Meake,*
    2014 WL 5819826 (M.D.N.C. Nov. 10, 2014) ............................................49

*Taylor v. Virginia Union Univ.,*
    193 F.3d 219 (4th Cir. 1999) ......................................................................15

*TransCanada Pipelines Ltd. v. USGen New England, Inc.,*
    458 B.R. 195 (D. Md. 2011)........................................................................18

*United States v. McCall,*
    934 F.3d 380 (4th Cir. 2019) ......................................................................53

*United States v. North Carolina,*
    180 F.3d 574 (4th Cir. 1999) ......................................................................54

*Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv., Inc.,*
    822 S.E.2d 597 (N.C. Ct. App. 2019)..........................................................43

*Volvo Trucks N. Am. v. Dep't of Transp.,*
    779 N.W.2d 423 (Wis. 2010) ......................................................................30

*Wahi v. Charleston Area Med. Ctr., Inc.,*
    562 F.3d 599 (4th Cir. 2009) ......................................................................15

*Wegman v. Dairylea Co-op., Inc.,*
    50 A.D.2d 108 (1975)..................................................................................16

*Westinghouse Elec. Corp. v. Garrett Corp.*,
  601 F.2d 155 (4th Cir. 1979) .........................................................28

*White v. Thompson*,
  691 S.E.2d 676 (N.C. Ct. App. 2010).....................................51, 52

*Wilcox v. City of Asheville*,
  730 S.E.2d 226 (N.C. Ct. App. 2012)...........................................44

*Williams v. United Cmty. Bank*,
  218 N.C. App. 361 (2012) ..............................................................48

**Statutes:**

15 U.S.C. § 78a *et seq.*...................................................................42

28 U.S.C. § 2106...............................................................................52

28 U.S.C. § 2111...............................................................................15

N.C. Gen. Stat. § 75-1.1................................................................*passim*

**Rules:**

Fed. R. App. P. 28.............................................................................17

Fed. R. App. P. 28(a)(8)(A) .............................................................17

Fed. R. Civ. P. 12(b)(6)..............................................11, 13, 14, 47

**Other Authorities:**

Restatement (Second) of Torts § 876 (1979)........................43, 44

## INTRODUCTION

Timothy Capps' ("Capps" or "Appellant") appeal is premised on his own self-serving version of the facts of this dispute. Capps presented this same story at trial. After reviewing the witness testimony and documentary evidence, Judge Flanagan of the United States District Court for the Eastern District of North Carolina, sitting as fact finder, soundly rejected Capps' claims. The district court is afforded deference in assessing the evidence and witness credibility.

The district court properly rebuffed Capps' conspiracy theories that he was set up to fail by his own company and colleagues. Instead, the district court correctly concluded that Capps was his own worst enemy; he materially and incurably breached his Broker Agreement with Newmark Southern Region, LLC ("Newmark") through a pattern of misconduct culminating in his attempt to defraud his employer.

Capps does not, and cannot, meet his high burden of demonstrating any reversible error. His blatant demand that this Court accept his discredited version of the facts should be rejected. The district court did not err by requiring Capps (the plaintiff) to demonstrate each element of his breach of contract claim or by concluding that he failed to establish his performance under the contract. This finding necessitated judgment against him on his breach of contract claim under fundamental principles of contract law. Even if Newmark bore the burden of

demonstrating Cause, the district court's decision shows that the evidence presented at trial warranted judgment in Newmark's favor. Likewise, Capps provides no basis to add back Newmark & Co. Real Estate Inc. ("Newmark & Co." and, together with Newmark, "Appellees") as a party, and to disturb the court's decision to dismiss four other claims at the pleadings stage. The district court's ruling in this regard withstands review, as it is in line with applicable authority. Capps has stated no basis for reversal as to any of the issues on appeal. This Court should affirm.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the district court err in requiring Capps to show, by a preponderance of the evidence, each element of his contract claim including that he had performed under the Broker Agreement?

2. Did the district court err in concluding after a four-day bench trial that Capps materially and incurably breached the Broker Agreement where the documentary evidence and credible witness testimony resoundingly demonstrated as such?

3. Did the district court err in granting Appellees' motion to dismiss Capps' claims for aiding and abetting breach of fiduciary duty, tortious interference with contract, civil conspiracy, and unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, under binding precedent that compelled disposition of those claims as a matter of law?

## COUNTERSTATEMENT OF THE FACTS

### A.     Capps Joins Newmark and Executes Certain Agreements

Newmark is the Atlanta-based subsidiary and southeast regional office of an international real estate brokerage and advisory firm. In January 2015, Capps and Greg Katz joined Newmark, bringing with them a team that they referred to as the Critical Transactions Group, or "CTG." (J.A. 2206.) Capps' association with

Newmark was memorialized in a Broker Agreement (the "Agreement"), pursuant to which he agreed to "work[] diligently to promote the business of the Company and to perform his responsibilities in a professional manner consistent with the terms of this Agreement and commercial real estate industry standards" and to "comply with any and all company policies." (J.A. 2203.) Capps acknowledged receipt of Newmark's Handbook and agreed to comply with the policies stated therein. (J.A. 2203-04.)

The Agreement specified a seven-year term, until January 2022, and provided Newmark the right to terminate "with or without Cause." (J.A. 2204.) Section 3(b) of the Agreement defined a "with Cause" termination as a "material breach by [Capps] of any of the provisions of this Agreement . . . that, *to the extent curable*, . . . is not cured within thirty (30) days of written notice." (J.A. 2204 (emphasis added), 2276.) In connection with joining Newmark, Capps received a total signing bonus of $1.5 million, composed of a $975,000 loan (the "Loan") and $525,000 of restricted partnership units in a non-party affiliate BGC Holdings, L.P. (J.A. 1658, 1702, 2289-92.)

## B.    The CTG Team Unravels Due to Infighting and Capps' Abusive Behavior

Capps was unsuccessful at Newmark. He routinely lost his temper, verbally abused team members, and acted unprofessionally towards clients and colleagues. (J.A. 1716-19, 1806-09, 2811-25.) In 2016, Capps and Katz privately hired a

consultant, Suzy Girard-Ruttenberg, to advise their group on how to resolve their conflicts. (J.A. 2206.) In June 2017, after meeting with Capps and hearing his coworkers' concerns about his "angry and threatening behavior," Girard-Ruttenberg was so afraid for the safety of her and others at the meeting that she asked that a plainclothes police officer be present at any future in-person meetings with Capps. (J.A. 2207.)

By July 2017, Capps' relationships with CTG team members were under considerable strain. (J.A. 1892-93.) On August 3, 2017, Katz told Capps he no longer wanted to work with him and wanted to dissolve the CTG team because Capps was feuding with team members and because Capps' disruptive behavior was counterproductive. (J.A. 1203-04, 1713-14, 2208.)

## C. Newmark's Human Resources Department Investigates the CTG Team and Warns Capps About his Misconduct

On August 3, 2017, the same day Katz told Capps he wanted to dissolve the CTG team, Capps complained to Newmark that a member of the CTG team, Monty Harris, had missed a meeting. (J.A. 2208.) Capps speculated Harris missed the meeting because he had been drinking, and further surmised Katz was covering for Harris. (J.A. 1203-04, 2208.)

Lindsay Sherman, Newmark's Director of Human Resources, investigated Capps' complaint. During the investigation, CTG team members reported numerous concerns about Capps' own conduct, including allegations of threatening and

4

unprofessional behavior. (J.A. 797-98, 1210-12, 2811-24.) Sherman also learned that Capps had, without authorization, instructed his assistant to access Katz's travel accounts using Katz's personal username and password. (J.A. 2209.)

On August 17, 2017, Sherman reported the findings of the investigation to Capps – Newmark had found no evidence to corroborate any of Capps' complaints, but it had found evidence of Capps' hostile, rude, and disrespectful behavior in violation of Newmark's code of conduct. Sherman advised Capps to "tone it down." (J.A. 2210.) Furthermore, Sherman warned Capps that his unsanctioned access of Katz's travel records "was very inappropriate," and that while no disciplinary action would be taken at that time, further misconduct could result in disciplinary action. (J.A. 2210.)

After August 17, 2017, Capps did not change his behavior in interacting with colleagues. (J.A. 2210.)

## D.    Capps Rejects Newmark's Efforts to Make Amends

In September 2017, Capps requested a meeting with Barry Gosin, Newmark's CEO, to discuss his future at Newmark given the dissolution of the CTG team. Capps demanded Newmark pay him $5 million under a new contract. In response, Newmark offered Capps a five-year contract extension with a $500,000 bonus. (J.A. 2212.) Gosin offered Capps the contract extension and bonus as a "peace offering" to "support[] him" and "end th[e] dispute" with Katz concerning dissolution of the CTG team so that Capps could build a new team. (J.A. 2213.)

Capps rejected Newmark's offer. By letter of October 9, 2017, Capps (through counsel) threatened litigation against Newmark unless Newmark acceded to either of two far more lucrative demands that would have required Newmark to pay Capps millions of dollars. (J.A. 2213, 3186, 3191-93.) Newmark rejected Capps' proposals.

Capps' frustration that Newmark would not cede to his demands affected his performance. On October 6, 2017, Capps expressed reluctance to pursue opportunities with Sonic Automotive ("Sonic"), a prospective client, unless Newmark agreed to his demands. (J.A. 1731-34, 2212.)

E. **Newmark's Counsel Discovers Capps' Attempts to Take a Personal Ownership Stake in a Property**

Also in Fall 2017, Capps and CTG team member Mike Hopper were preparing to pitch Sonic on the possibility of leasing a building at 300 Brevard Street in Charlotte, North Carolina (the "Brevard Property"). (J.A. 2211.) Capps and Hopper discussed pitching a potential sale of the Brevard Property to entities other than Sonic and negotiated a 25% personal equity stake in the building ($5-6 million for each broker) in lieu of a commission to Newmark.[1] (J.A. 1780-81, 2212.) Capps and Hopper discussed the possibility of obtaining equity in the building numerous times in person, as well as via phone, text, and email. (J.A. 1430, 1432, 1780-82,

---

[1] A provision of this nature is hereinafter referred to as an "equity clause."

1792-93, 1823, 1845-46, 2212.) Based on his discussions with Capps, Hopper, a more junior broker who reported to Capps, drafted the equity clause to include in draft agreements for potential Newmark clients. (J.A. 1789-93, 1822-23, 2216-17.)

On October 23, 2017, Sonic indicated it was not interested in the Brevard Property. At 6:03 p.m., Capps emailed Hopper discussing strategies for the Brevard Property. *Seven minutes later*, at 6:10 p.m., Hopper emailed Capps a draft brokerage agreement for prospective client Childress Klein Properties ("Childress Klein"). (J.A. 2216-17.) The agreement provided that in the event Childress Klein purchases the Brevard Property and the landlord cannot pay a commission to Newmark, "Mike Hopper and Tim Capps shall be distributed a dry equity piece of the asset . . . equal to twelve and one half percent (12.5%) each for a total of twenty-five present (25.0%)." (J.A. 2217.) On October 25, Hopper emailed the draft brokerage agreement to Childress Klein, copying Capps. (J.A. 2218.) Later that day, Hopper texted Capps that "Childress Klein is intrigued" and that Hopper "was very open on the phone about our brokerage agreement and what we are looking for." Capps responded they should "debrief" in the morning. (J.A. 2219.) Childress Klein did not pursue Newmark's proposal. (J.A. 2220.)

That same day, on October 25, the principal of Sonic introduced Hopper to the principal of Wheelock Street Capital ("Wheelock"). On October 27, Hopper sent Wheelock a draft brokerage agreement including an equity clause providing "Mike

Hopper and Tim Capps . . . an equity piece of the asset . . . equal to ten percent (10.0%) each for a total of twenty percent (20%)." (J.A. 2220, 3119-25.) On October 30, Hopper texted Capps saying, "need to discuss with you this morning . . . when are you available?" (J.A. 2221.) Capps responded he was available to discuss at 10:15 a.m. Soon after, Hopper forwarded to Capps the draft Wheelock agreement "for our discussion at 10:15am this morning," as well as an email from Wheelock rejecting the equity clause. (J.A. 2221, 3073-80, 3176.) On October 31, Hopper sent Wheelock an email that he "connected with Tim [Capps] yesterday and debriefed him," and proposed a revised agreement with a modified equity clause. (J.A. 2222.) Wheelock did not pursue Newmark's proposal. (J.A. 2222.)

At no point did Capps ask Hopper to explain the meaning or intent of the equity clause. Nor did Capps instruct Hopper not to send agreements including the equity clause to Childress Klein or Wheelock. Hopper spoke with Capps "every single day" and kept in "constant contact" with Capps, including discussing the proposed agreements. (J.A. 1845-1846.)

On November 7, 2017, Hopper sent a draft brokerage agreement to Holder Properties ("Holder"), which included an equity clause for Hopper and Taylor Senter, another CTG broker. (J.A. 2232-33.) Due to Holder's pushback on the concept, a final brokerage agreement for the Brevard Property, without an equity clause, was executed between Holder and Newmark on November 28. That same

day, Capps texted Hopper inquiring about the status of the brokerage agreement for the Brevard Property. Hopper responded the next day that "Holder signed it." Capps asked Hopper, "Please send me a copy." (J.A. 2233.) Hopper sent Capps the executed Holder agreement that same day. (J.A 2233, 3182-84.)

In late 2017, Wheelock informed Newmark it had received a draft agreement with an equity clause. (J.A. 116-17.) This information was brought to the attention of Newmark's Legal Department, who understood that the proposal was "incredibly brazen and totally improper," as well as prohibited by Newmark's policies. (J.A. 1407-09, 1561-63.) In December 2017, two Newmark in-house attorneys experienced with brokerage issues and conducting investigations began investigating the equity clause scheme. (J.A. 1402-03, 1557-59, 1618.)

On December 19, 2017, Newmark's counsel interviewed Hopper. Hopper acknowledged the equity clause was improper and apologized. He stated Capps was fully aware of, and directly involved in proposing the equity clause to Newmark's prospective clients. (J.A. 2234.) Hopper admitted he drafted the equity clause in the brokerage agreements at Capps' direction. (J.A. 1882-1823.) Hopper fully cooperated with Newmark and provided access to his laptop and his text messages with Capps. (J.A. 2234.) After completing its investigation, Newmark issued Hopper a disciplinary warning. (J.A. 2246, 2373.)

That same day, Newmark's counsel interviewed Capps. Capps denied knowing of the equity clauses and denied having read the related email correspondences. (J.A. 2234-35.) Newmark found Capps' explanation was not credible and was directly contradicted by (i) the interview with Hopper and (ii) contemporaneous emails and text messages demonstrating Capps' knowledge and involvement in proposing the equity clauses to prospective clients. (J.A. 1437-38, 1577-78, 1596.) Capps stated the only agreement he saw was the executed agreement with Holder. (J.A. 1438.) Capps told Newmark's counsel he asked Hopper to send the Holder agreement because he wanted "to see if his name was in it." (J.A. 1440, 2235.) Newmark's investigators found this answer suspicious because it implied Capps knew his name was in the equity clauses of the two agreements proposed to Childress Klein and Wheelock, and yet he had denied ever seeing them. (J.A. 1440, 2235.)

In connection with its investigation, Newmark's counsel interviewed Taylor Senter on December 22, 2017. Senter acknowledged the equity clause in the Holder agreement was improper. (J.A. 2236.) Newmark issued Senter a disciplinary warning. (J.A. 2246, 2374.)

## F. Newmark Terminates the Agreement for Cause

On February 26, 2018, Gosin had a call with Newmark's counsel concerning their investigation of the equity clauses. (J.A. 2237.) Newmark ultimately terminated

Capps' Agreement on March 21, 2018. (J.A. 2246.) The termination letter identified several instances of Capps' misconduct constituting material and incurable breaches of the Agreement, including (1) inappropriate conduct with colleagues; (2) personal data privacy violations; and (3) peddling the equity clause and lying to Newmark's counsel during the investigation of the equity clause. (J.A. 2343-44.) As specified in the letter, the termination was premised on a cumulative pattern of improper behavior. (J.A. 1449-51, 2343-44.)

## SUMMARY OF THE ARGUMENT

The district court did not err in ruling in favor of Newmark on Capps' breach of contract claim after a bench trial, nor did it err in dismissing on the pleadings Capps' claims against Appellees for aiding and abetting breach of fiduciary duty, tortious interference with contract, civil conspiracy, and unfair business practices under Fed. R. Civ. P. 12(b)(6).

*First*, after a four-day trial involving testimony from thirteen witnesses and the presentation of over 90 exhibits, the district court, in a carefully reasoned 53-page opinion, correctly concluded that Capps' for breach of contract claim failed.[2] The court properly applied the bedrock principle under New York contract law that Capps, as the plaintiff, had the burden of showing he had performed under the contract he sought to enforce. The district court concluded based on the evidence presented at trial that Capps

---

[2] The court also denied Capps' breach of the implied covenant of good faith and fair dealing claim. (J.A. 2551.)

had failed to perform his contractual obligations, and therefore denied his claim. There is no basis to disturb this holding, but even if the district court should have allocated to Newmark the burden of showing that Capps failed to perform, any error would be harmless. The court's ultimate conclusion was that Capps' failure to perform under the Agreement constituted material and incurable breaches of his contractual obligations – the exact finding Newmark would have proven if it had the burden to demonstrate the basis for the Cause termination.

*Second*, the district court's findings of material, incurable breaches by Capps were correct. These are fact-intensive issues for which the district court is afforded deference under appellate review, particularly because the decision turned on assessments of witness credibility and documentary evidence. Primarily, the court concluded Capps engaged in a scheme whereby he and two junior brokers – *without* the knowledge of others at Newmark – proposed agreements to prospective clients that provided for the brokers to receive personal equity interests in a subject property in lieu of Newmark receiving its commission. This finding alone constituted a material, incurable breach authorizing Newmark to terminate the Agreement for Cause and without notice. But the court also concluded that Capps materially and incurably breached the Agreement through a pattern of unprofessional, untrustworthy behavior. Neither of these findings were clearly erroneous; both were supported by overwhelming documentary and testimonial evidence.

*Third*, there is no basis to reverse the district court's ruling on the Appellees' Rule 12(b)(6) motion. The district court properly concluded the North Carolina Supreme Court would not recognize a cause of action for aiding and abetting breach of fiduciary duty. The court also correctly concluded that Capps failed to state a claim for tortious interference with contract because the allegations in the Complaint indicated Appellees' alleged conduct could not have been the proximate cause of the termination of any partnership agreement between Katz and Capps. This Court should reject Capps' attempt to rescue this claim by re-pleading allegations on appeal. Likewise, there is no basis to reverse the district court's dismissal of Capps' claim for civil conspiracy because any underlying tort claims against Appellees were dismissed at the pleadings stage, and any further tort claims against any alleged co-conspirators were dismissed before trial (which Capps does not challenge on appeal). Lastly, the district court correctly dismissed Capps' claim for unfair business practices under N.C. Gen. Stat. § 75-1.1, the North Carolina Unfair and Deceptive Trade Practices Act, because the law does not cover this type of dispute internal to the relationship between an employer and employee.

## STANDARDS OF REVIEW

On appeal from a bench trial, this Court reviews a judgment under a "mixed standard of review" pursuant to which factual findings may be reversed only if clearly erroneous, while conclusions of law are examined *de novo*. *Virginia Elec. &*

*Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 654 (4th Cir. 2017). An error is clear only if the court has a "definite and firm conviction" the trial court was mistaken. *Andrews v. Am.'s Living Ctrs.*, 827 F.3d 306, 312 (4th Cir. 2016). In reviewing factual findings, "the scope of [this Court's] review is narrow" and the Court should not "substitute [its] version of the facts for that found by the District Court." *Equinor USA Onshore Props. Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019). A trial court's "factual findings [that] turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial . . . are entitled to even greater deference." *Helton v. AT & T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013); *see Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008) (holding a trial court's credibility determinations "deserv[e] the highest degree of appellate deference" (quotation omitted)).

This Court reviews *de novo* the district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 179-80 (4th Cir. 2009). The factual allegations in a Rule 12(b)(6) motion "must be enough to raise a right to relief above the speculative level" and have "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "Moreover, the court 'need not accept the plaintiff's legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable

conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n. 26 (4th Cir. 2009) (alterations omitted) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).

If this Court determines the lower court erred, any error is harmless if it does "not affect the substantial rights of the parties." 28 U.S.C. § 2111 (West 2021); *see McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (explaining courts should "ignore errors that do not affect the essential fairness of the trial"). A ruling should be affirmed when the court can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (internal quotation marks omitted), *overturned on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

## ARGUMENT

## I. The District Court Properly Required Capps to Prove Performance Under the Agreement

New York law is clear that in a suit for breach of an employment contract, "a plaintiff bears the burden of proving by a preponderance of the evidence: (1) the existence of an enforceable contract; (2) performance by one party; (3) breach by the other party; and (4) damages." *Pisani v. Westchester Cty. Health Care Corp.*, 424 F. Supp. 2d 710, 719 (S.D.N.Y. 2006) (citing *Harsco Corp. v. Segui*, 91 F.3d

337, 348 (2d Cir. 1996)). A plaintiff cannot enforce a contract when he cannot carry his burden of demonstrating he performed his contractual obligations.

Capps misstates the district court's application of this non-controversial principle to fabricate a basis for appeal. Capps argues the court impermissibly allocated to him the burden of proving he did not materially breach the Agreement and that his breach was curable, "fault[ing] Capps for failing to prove a negative." (Brief of Appellant ("Capps Br.") at 23-25.) Not so. The district court simply allocated to Capps – the plaintiff – the burden of proving each element of his breach of contract claim, including that he performed under the Agreement. Once the court concluded Capps did *not* perform under the Agreement, it properly dismissed the claim. (*See* J.A. 2247-48.)

*Felsen v. Sol Cafe Mfg. Corp.*, 249 N.E.2d 459 (N.Y. 1969), *Wegman v. Dairylea Co-op., Inc.*, 50 A.D.2d. 108 (1975), and *O'Neill v. N.Y. Univ.*, 97 A.D. 3d 199 (2012), upon which Capps relies, do not contradict this principle. (*See* Capps Br. 23-24.) In neither case was it disputed (unlike the present case) that plaintiff failed to show performance under the contract. At most, they stand for the proposition that an employer bears the burden of showing cause to terminate when the employee's performance is *not* in dispute, or when the employee has otherwise met the burden of showing performance.

Capps does not dispute that under New York law a plaintiff seeking to enforce a contract has the burden of establishing performance. Capps' failure to do so constitutes a waiver or abandonment of any such argument under Federal Rule of Appellate Procedure 28, which requires that "appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). On that basis, the district court's decision on this issue must be affirmed. *See Meeker v. Edmundson*, 415 F.3d 317, 325 n.6 (4th Cir. 2005) (reasoning appellant "abandoned" his Fourth Amendment claim when appellant's "brief cite[d] no cases supporting the Fourth Amendment right he assert[ed]").

Alternatively, even if the district court misallocated the burden of proof, such analysis would constitute harmless error and would not be a basis for reversal. If, as Capps argues, "Newmark should have borne the burden of proving that it had cause to terminate" the Agreement (Capps Br. at 23), the evidence presented at trial firmly demonstrated Capps materially and incurably breached the Agreement in multiple ways supporting a "for Cause" termination. The district court found that Capps' "conduct in promoting the equity clauses and making false statements constituted a material breach of the Agreement," which "preclude[d] recovery by [Capps] on his breach of contract claim." (J.A. 2248.) The court also found Newmark "correctly and reasonably determined that plaintiff's violations of company policies in

promoting the equity clauses and in making false statements were not curable." (J.A. 2249.) Thus, because the court's findings were based on "the court's weighing of all of the relevant evidence presented at trial" and the court "would have yielded the same conclusion under a proper assignment of the burden of proof, any error with regard to the burden of proof is harmless." *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 328 (4th Cir. 2001); *see also TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195, 215 (D. Md. 2011) ("[W]here both parties have offered evidence, and where there is no 'evidentiary tie,' any improper assignment of the burden of proof is harmless.").

## II. The District Court Properly Found Capps Materially and Incurably Breached the Agreement

The evidence presented at trial demonstrated that Newmark terminated Capps for "a pattern of misconduct," including: (1) his role (which he lied to Newmark about) in the equity clause scheme; (2) his unprofessional and abusive behavior towards coworkers; and (3) his unauthorized access of his partner's personal travel accounts. Capps argues, without citation to any relevant authority, that Newmark had the burden of proving *each* example of his misconduct was a material and incurable breach. (Capps Br. at 25.) Not so. Under New York law, as long as a party has "the legal right to terminate its obligation under the contract, it is legally irrelevant whether the party was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract." *Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F. Supp.

738, 742 (S.D.N.Y. 1993), *aff'd*, 25 F.3d 105 (2d Cir. 1994). Newmark terminated the Agreement based on a "totality of the circumstances" including the results of the Human Resources investigation for which Capps had been warned, violations of the Company's policies, participation in the equity scheme, failing to cooperate with Legal's internal investigation, and making false statements to counsel. (J.A. 1460-61, 2248.) Capps' misconduct constituted a failure to perform his contractual commitments in the Agreement.

Furthermore, Capps cannot obtain reversal of the district court's decision by arguing the court's conclusions were erroneous as to the materiality or incurability of *some* but not *all* of the breaches identified in the termination letter. "[I]t is well-settled" that this Court "review[s] judgments, not opinions, which allows [it] to affirm the District Court on *any ground* that would support the judgment in favor of the party prevailing below." *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) (emphasis added) (internal quotation marks and citations omitted); *see also Cochran v. Morris*, 73 F.3d 1310, 1315 (4th Cir. 1996) (en banc) (noting the "well-recognized authority of courts of appeals to uphold judgments of District Courts on alternate grounds"). "[T]o obtain reversal of a District Court judgment based on multiple, independent grounds, an appellant must convince [the court] that *every stated ground* for the judgment against him is incorrect." *In re Under Seal*, 749 F.3d 276, 293 (4th Cir. 2014) (quoting *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014)) (emphasis

added) (internal quotation marks omitted). Newmark had Cause to terminate the Agreement so long as *any* of Capps' conduct constituted a material and incurable breach. Capps' burden is to demonstrate that *none* of his conduct, either individually or cumulatively, rose to this level. He does not meet this burden.

A. The District Court Properly Concluded Capps' Involvement in the "Equity Clause Scheme" Was Material and Justified "for Cause" Termination

Capps argues this Court should overturn the district court's finding that he materially breached his Agreement through his orchestration of the equity clause scheme. Capps' argument is premised on a fictitious, self-serving narrative that is belied by an overwhelming evidentiary record and applicable law.

Under New York law, "a material breach that goes to the root of the matter or the essence of the contract," such as a "scheme[] or gimmick[] that deprive[s] [the other party] of its contractual share of the gross profit," entitles the non-breaching party "to terminate the agreement, without opportunity to cure." *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 246-47 (E.D.N.Y. 1999). Furthermore, "[t]he power to terminate a contract following breach is one of election," as the "non-breaching party . . . may either continue to perform under the contract or it may terminate the contract." *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 668 (S.D.N.Y. 1996) (citing *Bigda v. Fischbach Corp.*, 849 F. Supp. 895, 901 (S.D.N.Y. 1994)), *aff'd*, 122 F.3d 1055 (2d Cir. 1997).

As an initial matter, the district court properly concluded that Capps and Hopper conceived of the equity clause scheme together. That fact-intensive determination is afforded deference. As referenced in the termination letter, the equity clause scheme amounted to "misappropriating commissions that might be earned by the Company." (J.A. 2344.) Capps' misconduct in this regard went to the root of the parties' contractual relationship. Therefore, as Newmark's CEO, Barry Gosin, testified at trial, the equity clause scheme amounted to "not paying Newmark its fair share" under the Agreement and therefore constituted a material breach. (J.A. 1524-25.)

In response, Capps insists he "did not know about or participate in Hopper's promotion" of the equity clause scheme due to a litany of baseless assertions. (Capps Br. at 40.) *First*, Capps asserts the direct evidence (or lack thereof) exonerates him. (Capps Br. at 40-41.) *Second*, Capps argues he did not intend to pursue a deal with the prospective clients who received the equity clause provisions. (Capps Br. at 40-45.) *Third*, Capps contends the district court erred in failing to discredit Hopper's testimony. (Capps Br. at 45.) Each argument was explicitly rejected by the trial court. None of the evidence Capps cites disputes the court's factual findings or rebuts the sound reasoning and inferences behind them.

1.  *The Record Is Clear that Capps Endorsed the Equity Clause Scheme*

The evidence presented at trial proved not only that Capps knew of the equity clause provisions in the draft agreements but that he was involved from the outset in devising the scheme. In response to Capps' testimony that he had nothing to do with the drafting of the equity clauses, the district court made clear that it "d[id] not accept plaintiff's contention as an accurate portrayal of the facts." (J.A. 2226-27.) Rather, the district court found that Capps and Hopper "discussed the possibility of getting equity in the building numerous times, in person, on the phone, via text and via email," and properly credited Hopper's live testimony stating the same. (J.A. 1782, 2226-27.) Hopper's testimony was corroborated by contemporaneous text message communications and emails. (J.A. 2216-22.) As the district court concluded, the obvious inference from Capps' admission that Hopper was junior to and reported to Capps, and the absence of any written evidence indicating Capps' disapproval of the equity clauses, was that Hopper was "fully dependent upon [Capps] approval and input." (J.A. 2219-20.) The district court also noted that Capps, an admitted control freak, himself stated that "Hopper was not allowed to communicate to [Capps'] clients without supervision" and "did not even understand what all the equity clause provisions meant," which strengthened the inference that Hopper "was acting at the direction of [Capps] . . . in drafting and proposing the equity clause provisions." (J.A. 2189-90.)

Nevertheless, Capps maintains the written evidence somehow exonerates him because "he *never* mentioned the equity clauses to Hopper or anyone else" in writing and "never responded" to emails and texts with draft agreements that included the equity clause. (Capps Br. 41.) This highly technical defense is the same story Capps told at trial. After weighing the evidence and assessing Capps' credibility, the district court rejected Capps' explanation. Instead, the court properly concluded Capps did not provide written feedback because he "was aware that the equity clauses were not proper or consistent with his usual commission-based approach, and thus sought to minimize references to them in writing, using instead phone conversations with Hopper to discuss them." (J.A. 2225.) This determination made by the district court sitting as fact finder at a bench trial should be afforded due deference under applicable law. Capps has not and cannot establish the court's decision was clearly erroneous.

For similar reasons, the district court properly rejected Capps' argument that Newmark presented no evidence showing "whether Capps ever opened the draft brokerage agreements that Hopper mailed to him." (Capps Br. at 42.) Given the evidence confirming that Capps had discussed and signed off on the equity clause provisions with Hopper orally, the metadata evidence would not have been dispositive. (J.A. 2237.) Furthermore, as the court found, Capps did not "show[] what type of evidence would demonstrate opening of a document attached to an

email, or lack thereof" and did not turn over his computer and phone to Newmark for investigation. (J.A. 2225.) This Court should again reject Capps' tired, already-refuted arguments, which are contradicted by the overwhelming evidence indicating his involvement in the equity clause scheme.

> ### 2. Capps Intended to Pursue a Deal with the Potential Clients to Whom the Equity Clause Provisions Were Proposed

Capps makes several misleading arguments as to why he never intended to pursue deals with Childress Klein and Wheelock. But Capps does not identify a single communication or cite to any testimony indicating he instructed Hopper to stop pursuing these developers to save the Brevard Property for a hypothetical deal with Sonic. Given Hopper's testimony that Capps fully endorsed the pursuit of these developers and the equity clause proposals sent to them, Capps' admission that Hopper reported to him, and the voluminous written evidence corroborating Capps' approval of Hopper's actions, the absence of any contrary evidence is fatal to Capps' argument. That alone is sufficient to affirm the court's decision that Capps condoned the equity clause scheme and that his denials are not credible.

Nevertheless, none of the "evidence" Capps now cites demonstrates he did not intend to pursue Childress Klein or Wheelock in October 2017. For example, Capps claims he would not have pursued a sale of the Brevard Property because it would have precluded a more lucrative leasing deal with Sonic. The district court, however, disposed of this notion and found that as of October 23, 2017, Sonic indicated it was

not interested in the Brevard property, "which served as a renewed trigger for plaintiff and Hopper to continue . . . pursuing other entities with an agreement that included an equity position." (J.A. 2216.)  In fact, the evidence at trial was that *Sonic* referred Capps to the principal of Wheelock, to whom Capps and Hopper then proposed an equity clause.  (J.A. 2226.)  Had Sonic remained interested in the Brevard Property, it would not have redirected Capps to Wheelock.  Here again, Capps asks this Court to adopt a version of the facts the district court already rejected.

Nor does any of the "evidence" Capps now cites demonstrate he intended to reserve a deal on the Brevard Property for Sonic during the final week of October 2017, at which time Capps and Hopper proposed the equity-clause provisions to Childress Klein and Wheelock.  None of the evidence Capps cites to argue he "was still in talks with Sonic" after October 23, 2017 (Capps Br. at 44) indicates that any such talks included a potential deal on the Brevard Property.  (*See* J.A. 2624, 3156.) Similarly, Capps' references to his actions in *December* 2017, in marketing the Brevard Property to Sonic and making Hopper cancel a deal to preserve an opportunity with Sonic, have no bearing on whether Capps intended to pursue Childress Klein or Wheelock in *October* 2017.  As the court found (which Capps does not dispute), neither Childress Klein nor Wheelock followed up after receiving the draft proposals containing the equity clause provisions in October 2017. (J.A. 2220, 2222.)

Furthermore, the district court rejected Capps' contention that he would not have pursued developers, whom he "had never represented," and who were the "wrong type of client." (Capps Br. at 40-41, 43-44.) The court reasoned that Capps' argument ignored "two important circumstances" that made this scenario unique. *First*, Capps had an incentive to structure his compensation in a way that cut Newmark out of the business, due to his recently failed compensation negotiations with Newmark. *Second*, due to the distressed nature of the property, the seller might not be able to afford to pay a commission to Newmark. (J.A at 2223-24.) Consequently, Capps had a greater incentive to try to engage developers as clients and seek equity for himself than he did earlier. This is precisely the type of credibility determination for which the district court is afforded deference.

Lastly, Capps cannot now take issue with the lack of testimony at trial from the developers who received the equity clauses. Having failed himself to introduce any testimony from these developers, Capps has waived any argument that the court erred in reaching its findings in the absence of such testimony. *See Morris v. Bland*, No. 5:12-CV-3177-RMG, 2014 WL 12637911, at *11 (D.S.C. Dec. 31, 2014) ("[F]ailure to introduce such evidence at trial constitutes a waiver of the issue."); *cf. Agra, Gill & Duffus, Inc. v. Benson*, 920 F.2d 1173, 1176 (4th Cir. 1990) ("We will not accept on appeal theories that were not raised in the District Court except under unusual circumstances that would result in a miscarriage of justice."). This appeal is not an opportunity for Capps to obtain a do-over.

### 3.    *Hopper Did Not Improperly Acquire Information about the Trial Prior to Testifying*

Similar to other arguments that Capps now re-litigates, the district court rejected Capps' demand that Hopper's testimony be excluded because Hopper allegedly violated the court's witness sequestration order when he "met over dinner with Newmark's corporate representative . . . who had heard all the testimony presented thus far." (Capps Br. at 41-42.)  Indeed, as the district court noted, Hopper testified he did *not* discuss with Newmark either his testimony or any other information he should not have learned prior to testifying.  (J.A. 1851, 2229.)  Capps does not substantiate through even a *single* record citation his naked accusation that Hopper discussed what had already happened at trial with those in the know.  (Capps Br. at 41-42.)  Nor could he, because no such evidence exists.  Therefore, the court's refusal to exclude or discredit Hopper's testimony was not clearly erroneous.  Indeed, when it suits him, Capps argues that credibility determinations should have been made in his favor, but he cannot escape the reality that his own credibility was assessed and rejected by the district court.

### B.    The District Court Properly Concluded Capps' Involvement with the Equity Clause Scheme Was an Incurable Breach

Capps argues, without a single citation to the record or to legal authority, that "[t]he district court failed to engage in any curability analysis, which itself requires reversal."  (Capps Br. at 26.)  Capps never explains what would constitute a

"curability analysis" and he ignores the district court's detailed factual determination that Capps' misconduct was incurable. Indeed, the district court found that after Newmark's "human resources department fairly gave [Capps] a chance to improve" after discovering his "threatening conduct and violation of technology policy," Newmark "reasonably concluded that [Capps'] violations of company policies, taken together, were not curable" after "determin[ing] that [Capps] had been involved in further improper conduct, was not forthcoming, and lied during the course of the investigation." (J.A. 2239.) The district court confirmed that after enduring Capps' pattern of misbehavior, Newmark "correctly and reasonably determined that [Capps'] violations of company policies in promoting the equity clauses and in making false statements were not curable." (J.A. 2249.)

### 1. This Court Should Review the District Court's "Curability Analysis" for Clear Error

Capps mistakenly argues that "[c]urability is a question of law reviewed *de novo*." To the contrary, this Court "review[s] a District Court's factual findings after a bench trial for clear error." *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 885 F.3d 271, 276 (4th Cir. 2018); *see also Westinghouse Elec. Corp. v. Garrett Corp.*, 601 F.2d 155, 157-58 (4th Cir. 1979) (holding factual finding of breach was not clearly erroneous). A court's determination of if and when a party "could have cured [a] breach" is a question of fact when those facts are disputed (as was the case here). *Spires v. Sch.*, 271 F. Supp. 3d 795, 801 (D.S.C. 2017).

None of Capps' cited authorities compel a *de novo* review. Both *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004), and *L.K. Comstock & Co. v. United Engineers & Constructors Inc.*, 880 F.2d 219, 231 (9th Cir. 1989), merely stand for the routine proposition that interpretation of a contract is a question of law. Here, the district court applied its findings of fact about Capps' breaches to straightforward contract terms and concluded Capps' breaches were incurable. Similarly, Capps relies on *Moulden*, a Washington case deciding whether "[u]nder Washington practice," a certain action "constituted a 'cure,'" and *Nationwide*, an unpublished Ohio case about whether "on undisputed facts, a cure is legally effective." *See Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 584 P.2d 968 (Wash. Ct. App. 1978); *Nationwide Mut. Ins. Co. v. United Comput. Cap. Corp.*, No. 16340, 1994 WL 78640 (Ohio Ct. App. Mar. 16, 1994). These cases have no precedential value in the Fourth Circuit. Even if they did, they are clearly inapposite.

Capps erroneously alleges the district court "gave no explanation for its conclusions" and did not "cite any supporting evidence" that Capps incurably breached the Agreement. (Capps Br. at 28.) On the contrary, as explained *supra*, the detailed order contains specific factual findings explaining that Capps incurably breached the Agreement through a pattern of misconduct.

Capps also argues the district court "failed to apply the law governing curability" and gave "no explanation for its conclusions." (Capps Br. at 28.) The district court did explain the basis for the decision, but even if it did not it is of no moment. Whether "the district court did not explain the reasoning behind its determination" on an issue is not a basis for reversal. *Pashby*, 709 F.3d at 322. This Court "review[s] judgments, not opinions," and "may . . . affirm the district court's conclusion . . . as long as the record supports this conclusion." *Id.* (internal quotation marks omitted); *see also Catawba Indian Tribe of S.C. v. City of Rock Hill, SC*, 501 F.3d 368, 372 n.4 (4th Cir. 2007) ("Although the district court assumed – without finding – that the contract was impaired, we review judgments, not opinions" and "are accordingly entitled to affirm the district court on any ground that would support the judgment in favor of the party prevailing below.").

### 2. *Capps' Misconduct Was Not Curable*

Capps suggests that any breach of the Agreement could be cured. (Capps Br. at 29.) Capps provides zero relevant authority in favor of this claim and instead cites: (1) a Wisconsin Supreme Court decision interpreting a *Wisconsin motor vehicle statute*, *see Volvo Trucks N. Am. v. Dep't of Transp.*, 779 N.W.2d 423 (Wis. 2010), (2) an Eastern District of Wisconsin decision analyzing whether *Wisconsin* law permits a party to terminate without giving the other party opportunity to cure, *see Manpower Inc. v. Mason*, 377 F. Supp. 2d 672 (E.D. Wis. 2005), and (3) a

District of Minnesota decision, applying *Minnesota* law, that does not address when a breach can be considered incurable. *See Anacapa Tech., Inc. v. ADC Telecommunications, Inc.*, 241 F. Supp. 2d 1016 (D. Minn. 2002). Capps conspicuously does not cite any authority analyzing when a breach of contract is incurable under *New York law*, which governs the Agreement.

Under New York law, "a material breach that goes to the root of the matter or the essence of the contract" entitles the non-breaching party "to terminate the agreement, without opportunity to cure." *Froelich*, 41 F. Supp. 2d at 246-47. Such breaches include a party's engaging in "schemes or gimmicks that deprive [the other party] of its contractual share of the gross profit" under the agreement. *Id.* at 247; *see also Southland Corp. v. Mir*, 748 F. Supp. 969, 984 (E.D.N.Y. 1990) (defendant's "enter[ing] into a scheme knowingly and willfully to deprive Southland of its right to 50% of the gross profits" was an incurable breach of a franchise agreement). Here, the district court found Capps directed a scheme whereby he would obtain a personal equity stake in a property in lieu of a commission to be shared with Newmark. (*See* J.A. 2212-31.) Capps' breach of the Agreement was geared at depriving Newmark of its anticipated profit, the benefit of the bargain under the Agreement. The district court concluded that the scheme was "inimical to the business interests of [Newmark]" and constituted a "business activity in competition with [Newmark]." (*See* J.A. 2247-49.) As in *Froelich* and *Mir*, Capps'

breach went "to the root of the matter or the essence of the contract," entitling Newmark to terminate the Agreement for Cause without giving Capps opportunity to cure.

Capps further argues that "[e]ven if Newmark had proven that Capps participated in Hopper's equity-clause scheme, Newmark did not prove that such a breach was incurable." (Capps Br. at 45.) Again, Capps repackages the identical claims the district court discredited. The lone case Capps cites, *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989), states that where an unqualified opportunity to cure is required it must be provided for termination to be effectual. Newmark agrees the Agreement must be terminated according to its terms. The Agreement, however, by its terms only requires an opportunity to cure *to the extent curable*. Unlike *Filmline,* Newmark acted promptly upon learning of Capps' role in the equity clause scheme and therefore did not waive any termination right. The district court properly concluded that Capps' multiple breaches of the Agreement were not curable.

Capps argues he "cure[d]" this breach by following Newmark's request that he send "all draft brokerage agreements to in-house counsel for review." (Capps Br. at 47.) This is unconvincing. Newmark never presented this request to Capps as a "cure request." Newmark had a pre-existing *standard* policy requiring all brokerage agreements to be reviewed by counsel before being sent to a client. (J.A. 2650,

3096.)  Newmark ultimately determined Capps breached this policy through the equity clause scheme.  There is no evidence that this reminder was a "cure request" as Capps argues.  Rather, the evidence shows that Newmark did not intend this reminder of existing company policy to be a "cure request" for Capps' breaches, because Newmark was still in the process of investigating the equity clause scheme.  (J.A. 1438-40, 1578-79, 2529-30.)  As such, Capps' claim that he "compli[e]d with [a] cure request" from Newmark is wrong.

Capps argues his attempt to misappropriate corporate opportunities was curable because Newmark did not terminate the junior brokers who were involved.  (Capps Br. at 46-49.)  "The power to terminate a contract following breach is one of election" and Newmark's actions with respect to Senter and Hopper were not concessions as to the curability or materiality of Capps' breaches but simply elections by Newmark to "continue to perform under the[ir] contract[s]" with the other brokers.  *See Alesayi Beverage Corp.*, 947 F. Supp. at 668.  This litigation is not about Hopper or Senter, and their personal contractual obligations and purported breaches were not before the court.  Whether Newmark properly terminated Capps' Agreement is unrelated to how Newmark dealt with other brokers.

The record shows Capps' conduct was worse than that of the others.  *First*, Hopper and Senter were "forthcoming" about their involvement in the scheme.  (J.A. 1482, 1488-89.)  By contrast, Capps falsely claimed to having no knowledge of the

equity clause provisions. (J.A. 1576-78.) Newmark did not find his story credible because it was contradicted by numerous written communications Capps received and statements he made to investigators indicating he knew the draft agreements included his name. (J.A. 1438-40, 1578-79.) *Second*, because Hopper and Senter were junior brokers who were "underneath . . . Capps in the hierarchy" (J.A. 1450-51), Capps bore responsibility and due to his experience, he "should [have] know[n] what the right behavior" would have been. (J.A. 1525-26.) *Third*, unlike the other brokers, the equity clause scheme was, for Capps, another instance in a pattern of "destructive" behavior that "was not acceptable to the company," including abusing other colleagues and spying on Katz's travel schedule. (J.A. 1460, 1553.) The district court properly ruled that Capps' participation in the equity clause scheme was a material and incurable breach of Agreement warranting termination with Cause.

C.   The Court Properly Found Capps' Unprofessional Behavior Was a Material and Incurable Breach of Contract

Newmark cited Capps' unprofessional and unethical behavior – including his abusive, threatening behavior towards coworkers and his spying on his former partner's travel records – as *one of several* reasons for terminating the Agreement. (J.A. 2343-44.) Capps now argues the district court "did not conclude that these grounds constituted material breaches, yet it relied on these grounds to enter judgment for Newmark," which he asserts is an "error on a central issue [that]

requires reversal all by itself." (Capps Br. at 30.) Capps, however, grossly contorts the district court's opinion, which if read properly soundly rejects Capps' argument.

The district court did not "rely" on the materiality of Capps' breaches of his agreement through his unprofessional behavior in entering judgment for Newmark. Newmark was entitled to terminate the Agreement without notice so long as *any* of Capps' conduct constituted a material and incurable breach. *See Eastbourne*, 815 F. Supp. at 742. The evidence presented at trial proved that Capps played a central role in the equity clause scheme (and then lied about it), which the court concluded "constituted a material breach of the Broker Agreement" and was "not curable." (J.A. 2248-49.) On that basis alone, Newmark had grounds to terminate Capps's Agreement; whether the district court erroneously concluded that there were *other* grounds for termination without opportunity to cure is not a basis for reversal. *See Pashby*, 709 F.3d at 322; *In re Under Seal*, 749 F.3d at 293; *Stolfa v. Arnold Sales Co., Inc.*, No. 06-CV-2085 (JS)(WDW), 2007 WL 9710388, at *13 (E.D.N.Y. Mar. 30, 2007).

### 1. The Court's Findings are Consistent with New York Law

Under New York law, when a breach involves "deceptive conduct that goes to the essence of the contract and fundamentally destroys the parties' relationship, it may not be subject to cure." *Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, No. 11 CIV. 3130 (DLC), 2012 WL 4049955, at *15 (S.D.N.Y. Sept. 14, 2012). For

example, New York courts have found that because a "high standard of ethical care" under a business agreement between two parties is "a fundamental expectation of both parties, a foundation of their agreement and the essence of their bargain," "deceptive business practices" by one party constitute an "egregious violation" that is "not curable since recapture of a reputation for probity require[s] turning back the clock." *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, No. 13-CV-0520, 2013 WL 1968371, at *4 (E.D.N.Y. May 10, 2013), *aff'd*, 756 F.3d 204 (2d Cir. 2014).

The district court properly concluded that Capps' pattern of unprofessional behavior was a material breach of contract. For example, as Newmark stated in its termination letter to Capps, his "unauthorized access" of Katz's personal travel accounts "was a serious breach of trust and confidence." (J.A. 2343-44.) Similarly, Newmark's in-house counsel testified Capps was terminated in part due to a "pattern . . . of behavior that was not trustworthy," and Newmark's CEO testified that Capps was "continuously and relentlessly being destructive" to the company. (J.A. 1460-61, 1553.) Capps' continued misbehavior was not merely unprofessional, but deceptive, unethical, and destroyed the trust from Newmark that was fundamental to the parties' relationship. And, because Capps' behavior was ongoing and fit into a pattern of untrustworthy conduct, Newmark correctly concluded that Capps' breaches were not curable because after the company gave him multiple opportunities to succeed and he failed, it was too late for him to regain the company's confidence.

In addition, the court concluded that Capps' "violations of company policies," which included "directing his assistant to access Katz's travel records" and "engaging in threatening and intimidating conduct towards co-workers," "provided in combination a valid *cause for termination that was not curable.*"  (J.A. 2249 (emphasis added).)    Thus, by explicitly concluding that Capps' repeated unprofessional behavior was an incurable "cause for termination," the court also established that this conduct was a material breach of the Agreement.  Capps cannot meet his burden of establishing clearly erroneous error in the district court's determination of these fact issues.

Nevertheless, Capps contends Newmark was required to provide him "'written' notice" of any material breaches and an opportunity to cure (Capps Br. at 33-34), and that any behavioral misconduct had been "cured by the time of termination." (Capps Br. at 38-39.)  As indicated above, Capps' breaches were both material and incurable under New York law due to his pattern of dishonest, unethical conduct that destroyed Newmark's trust in him.  Consequently, Newmark was not obligated to provide a cure period.  *See, e.g.*, *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014) ("New York common law will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless, or if the breach undermines the entire contractual relationship such that it cannot be cured.").  The only two cases Capps

cites are inapposite, as in both cases it was either conceded by the parties or decided by the court that the breaches in question were curable. *See In re 4Kids Entm't, Inc.*, 463 B.R. 610, 707 (Bankr. S.D.N.Y. 2011) (finding plaintiff's argument that the breach could not be cured lacked credibility having previously accepted payment to cure the breach); *Kalus v. Prime Care Physicians, P.C.*, 799 N.Y.S. 2d 115 (2d Dep't 2005) (where the question of whether breach was curable was not at issue, the court determined defendant did not satisfy its obligation to provide notice that plaintiff needed to cure).

Desperately, Capps argues his conduct could not have constituted a material, incurable breach "because Newmark has forgiven far worse," including brokers who have previously been fired for sexual harassment, had alcohol problems, or used coarse language with coworkers. (Capps Br. at 35-36.) None of this is in the record and Capps' irrelevant mud-slinging is tellingly weak. Moreover, this argument overlooks that when Newmark terminated Capps, it did not view his misbehavior as a series of isolated occurrences. Rather, Newmark viewed Capps' misconduct as a pattern of behavior that ultimately revealed he was "not trustworthy." (J.A. 1460-61, 2343-44.) Capps' argument concerning other brokers is not a legal defense; Newmark's right to terminate contracts is not an obligation but "one of election." *See Alesayi Beverage Corp.*, 947 F. Supp. at 668. That Newmark allegedly elected to retain other brokers involved in unrelated conduct that may have provided grounds

for termination under separate agreements did not prohibit Newmark from terminating Capps when it had the right to do so under the Agreement.

### 2. Newmark Did Not Waive Its Right to Terminate Capps for his Unprofessional Behavior

Capps asserts without citation to any legal authority, that Newmark waived any right to terminate him for his repeated unprofessional behavior because in September 2017, Human Resources concluded its investigation with a "verbal warning," after which Gosin attempted to extend Capps' contract and offered him a bonus. (Capps Br. at 32-39.) That argument ignores that Capps' unprofessional and dishonest behavior did not stop in mid-2017 and mischaracterizes Capps' termination as based solely on "conduct that happened six months earlier." (Capps Br. at 37-38.) The termination letter made clear, Capps' "pattern of misconduct" included incidents that came months after Human Resources concluded its investigation, including lying to Newmark's in-house counsel about his role in the equity clause scheme. (J.A. 2343-44.) As Newmark's in-house counsel testified, at the time Newmark terminated the Agreement in March 2018, the company considered "the totality of Mr. Capps' conduct." (J.A. 1460-61.) Similarly, Gosin testified that despite Newmark's earlier hope that Capps would "move on" from his prior misbehavior, his "destructive" actions continued. (J.A. 1553.) Capps admitted he continued to use foul language and act aggressively toward other teammates after the warning. (J.A. 1768.)

Moreover, as a matter of law, "[g]ood faith attempts to realize contractual benefits by negotiating with a counterparty, rather than immediately filing suit, do not constitute an election of remedies." *MBIA Ins. Corp. v. Patriarch Partners VIII*, 842 F. Supp. 2d 682, 711 (S.D.N.Y. 2012). "[A] party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future." *Seven-Up Bottling Co. (Bangkok) v. PepsiCo.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988). In this instance, as Gosin testified, Newmark negotiated with Capps in September 2017 as a means to "resolve" the infighting between him and Katz. (J.A. 1519-20.) Gosin stated that the additional bonus he offered to Capps in the context of a contract extension was a "peace offering" aimed at "end[ing] the dispute." (J.A. at 1520-21.) Therefore, because during negotiation with Capps in September 2017 Newmark made a good-faith attempt to extend Capps' contract and give him another opportunity to succeed without engaging in misconduct, Newmark was not precluded from later citing Capps' misconduct as a cause for termination.

**III. The District Court Correctly Dismissed the Aiding and Abetting Claim at the Pleadings Stage**

    A.    <u>The District Court "Predicted" that the North Carolina Supreme Court Would Not Recognize a Cause of Action for Aiding and Abetting Breach of Fiduciary Duty</u>

The district court properly dismissed Capps' aiding and abetting breach of fiduciary duty claim as a matter of law. In arguing that his claim should not have been dismissed at the pleadings stage, Capps argues the court failed to decide under the *Erie* doctrine whether the North Carolina Supreme Court would recognize this as a cause of action. (Capps Br. at 50.) To the contrary, the district court did exactly what Capps argues it failed to do. Indeed, in granting Appellees' motion to dismiss, the court predicted the North Carolina Supreme Court would not recognize a cause of action for aiding and abetting:

> In *Bottom v. Bailey*, the North Carolina Court of Appeals court stated that its only prior case recognizing an aiding and abetting a breach of fiduciary duty claim was "no longer valid precedent." 238 N.C. App. 202, 211 (2014). This, combined with the fact that the North Carolina Supreme Court has not recognized such a cause of action, shows that the North Carolina Supreme Court likely would not recognize such a cause of action.

(J.A. 153.) On that basis alone, Capps' argument fails.

    B.    <u>North Carolina Courts Have Made Clear that the North Carolina Supreme Court Would Not Recognize This Cause of Action</u>

On matters of North Carolina law, this Court "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding, and 'depart[ing] from an intermediate court's fully reasoned holding as to state law

41

*only if* 'convinced' that the state's highest court *would not* follow that holding.'"
*Iodice v. United States*, 289 F.3d 270, 275 (4th Cir. 2002) (emphasis added) (quoting
*Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1003 (4th Cir. 1998)).
Although the North Carolina Supreme Court has not ruled on whether a cause of
action for aiding and abetting breach of fiduciary duty exists under North Carolina
law, the recent decisions from the North Carolina Court of Appeals – the state's
intermediate appellate court – make clear that the district court in this matter did not
err in concluding that the supreme court would not recognize aiding and abetting
breach of fiduciary duty as an independent cause of action.

Capps identifies only one case, *Blow v. Shaughnessy*, 364 S.E.2d 444 (N.C.
Ct. App. 1988), where the Court of Appeals recognized a cause of action for aiding
and abetting breach of fiduciary duty. In *Blow*, the Court of Appeals stated that "a
cause of action on this theory has been recognized by federal courts in securities
fraud cases based on violations of section 10(b) of the Securities Exchange Act of
1934." *Blow*, 364 S.E.2d at 447. However, this rationale was later abrogated by the
United States Supreme Court, when it held that "a private plaintiff may not maintain
an aiding and abetting suit under [Section] 10(b)." *Cent. Bank of Denver v. First
Interstate Bank of Denver*, 511 U.S. 164, 191 (1994). Consequently, the last *five*
opinions from the Court of Appeals discussing *Blow* have recognized that *Blow* has
been abrogated and have declined to recognize a cause of action for aiding and

abetting breach of fiduciary duty.  *See BDM Invs. v. Lenhil, Inc.*, 826 S.E.2d 746, 763 (N.C. Ct. App. 2019); *Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv., Inc.*, 822 S.E.2d 597, 598 (N.C. Ct. App. 2019); *Bottom*, 767 S.E.2d at 889; *Land v. Land*, 729 S.E.2d 731 (N.C. Ct. App. 2012); *Ehrenhaus v. Baker*, 717 S.E.2d 9, 29 (N.C. Ct. App. 2011).  The Court of Appeals' recent guidance has not been "conflicting," as Capps asserts (Capps Br. at 52), but in fact resoundingly consistent in refusing to recognize this cause of action.[3]

Capps also argues that, notwithstanding the recent holdings from the Court of Appeals, the district court should have considered *Blow* to still be controlling because "*Blow*'s reasoning . . . was tethered" (Capps Br. at 55) to Section 876 of the Second Restatement of Torts ("Section 876") and to *Boykin v. Bennett*, 118 S.E.2d 12 (N.C. 1961), in which the North Carolina Supreme Court relied on Section 876 to find that multiple motorists engaged in a race on a highway could be found jointly liable for an accident that ensued and led to the death of one of the car's passengers. *Boykin*, 118 S.E.2d at 16-17.  This argument is unavailing.  The North Carolina Court of Appeals has been "reluctant to extend [Section 876] to factual scenarios outside of those specifically provided in the Restatement or in established case law."  *Lee v.*

---

[3] Capps cannot overcome this precedent by relying on two irrelevant federal bankruptcy court decisions to the contrary (Capps Br. at 55-56).  The Court of Appeals has stated that bankruptcy court decisions are not binding precedent on North Carolina state courts.  *Bottom*, 767 S.E.2d at 889.

*Certainteed Corp.*, 123 F. Supp. 3d 780, 799 (E.D.N.C. 2015). And, *Boykin* is readily distinguishable because the issue was negligence of tortfeasors who participated in a "joint venture" of "a race of motor vehicles in speed competition on a public highway." *Boykin*, 118 S.E.2d at 17. Nothing in *Boykin*'s holding indicates that the North Carolina Supreme Court would also rely on Section 876 to recognize a cause of action for aiding and abetting a breach of fiduciary duty. *See* Restatement (Second) of Torts § 876 (1979). Likewise, none of the additional cases that Capps cites in arguing that Section 876 "has been applied by . . . the state's intermediate appellate court" involve recognizing a cause of action for aiding and abetting breach of fiduciary duty. *See Wilcox v. City of Asheville*, 730 S.E.2d 226, 235-36 (N.C. Ct. App. 2012) (negligence related to shooting recklessly at a vehicle); *Stetser v. TAP Pharm. Prod., Inc.*, 598 S.E.2d 570, 583 (N.C. Ct. App. 2004) (tortious action in concert related to consumer fraud); *McMillan ex rel. McMillan v. Mahoney*, 393 S.E.2d 298, 300 (N.C. Ct. App. 1990) (negligence related to discharging rifles recklessly).

Lastly, Capps asserts several arguments, all untethered to any binding North Carolina authority, as to why the district court should have predicted that the North Carolina Supreme Court would recognize this cause of action. Capps argues that recognizing this cause of action would "advance[] the state's public policy" of "strictly enforc[ing] the duties of fiduciaries." (Capps Br. at 53-54.) Capps also

argues that this cause of action is "in the mainstream of American jurisdictions," and cites a number of decisions either dealing with claims other than aiding and abetting breaches of fiduciary duty or dealing with laws of states other than North Carolina. (Capps Br. at 54, 56-58.) He suggests this Court should rule in his favor "[t]o avoid embarrassment" in the event that North Carolina courts later decide to "follow the Restatement and American mainstream" and recognize this cause of action. None of these is a basis for the district court to ignore the clear, consistent guidance from the North Carolina Court of Appeals that this cause of action is not viable. The district court did not err in ruling that the North Carolina Supreme Court is not likely to recognize this cause of action.

## IV. The District Court Correctly Dismissed the Tortious Interference with Contract Claim

To establish a claim for tortious interference with contract under North Carolina law, Capps must have pleaded: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally *induces* the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *Esposito v. Talbert & Bright, Inc.*, 641 S.E.2d 695, 697 (N.C. Ct. App. 2007) (emphasis added) (internal citations omitted). North Carolina courts have reasoned that the third element of this claim requires the defendant's actions be the but-for cause of the party's failure to

perform.  In *Moore v. Nationwide Mut. Ins.*, 136 F. Supp. 2d 518, 521 (M.D.N.C. 2001), the court found there was no tortious interference by Nationwide when two individuals testified that "Nationwide did not induce them to leave the Moore Agency, and that they had already told Moore prior to June 15, 1998, that they were not going with him to Southeastern."  Similarly, in *Esposito*, the court found no tortious interference where "plaintiff's forecast of evidence d[id] not show defendants intentionally induced NCDOT to terminate plaintiff's employment" because "Defendants' allegations and problems with plaintiff were but one of six instances of unacceptable conduct upon which NCDOT based the termination of plaintiff's employment."  641 S.E.2d at 697.  Because in these cases the contracts would have been terminated regardless of the defendants' alleged actions, there was no causation.

That is exactly the reason the district court dismissed Capps' tortious interference claim.  The district court held that Katz had stated his intention to dissolve the partnership by the date of Newmark's alleged interference.  Newmark's conduct could not have been the proximate cause of any contractual breach.  (J.A. 157-58.)  Capps misrepresents the court's opinion as somehow constituting a legal conclusion that no contract existed at the time of alleged interference.  But that clearly misstates the court's analysis of the facts pleaded by Capps in the complaint, which could not support causation.(J.A. 156-58.)

Capps argues "the complaint alleged [that] Newmark induced and helped Katz breach his obligations to wind up the partnership" and since "Newmark admitted that CTG was not terminated at dissolution" at trial, Newmark can be held liable for interference during the wind-up period. (Capps Br. at 60.) There is one glaring problem with this argument: *Capps' Complaint pleads no such allegations*. Capps' tortious interference claim was limited to the allegation that Newmark induced Katz and Harris to breach the "*ongoing* and enforceable contractual *relationship in the CTG Partnership*" that "benefitted Capps economically and likely would have *continued to benefit Capps into the future.*" (J.A. 74 at ¶¶ 141-143 (emphasis added).) Capps' Complaint does not refer to Katz's wind-up obligations. In deciding whether the Complaint "state[d] on its face a plausible claim for relief and therefore c[ould] survive a Rule 12(b)(6) motion," the district court was limited to evaluating "the well-pleaded facts." *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Because Capps' Complaint did "not plead sufficient underlying facts to support [his] bare legal assertions," the district court properly dismissed his tortious interference claim. *See Burnley v. Norwood*, No. 3:10CV264-HEH, 2010 WL 3063779, at *6 (E.D. Va. Aug. 4, 2010). This Court should deny Capps' attempt to re-plead his allegations on appeal.

## V.     The District Court Correctly Dismissed the Civil Conspiracy Claim

A complaint sufficiently states a claim for civil conspiracy when it alleges (1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy. *Krawiec v. Manly*, 370 N.C. 602, 614 (2018).  To create civil liability for conspiracy, "there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective." *Id.* (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 811 S.E.2d 542, 550-51 (N.C. Ct. App. 2008)).  In the absence of an underlying tort, a party's claim for civil conspiracy fails. *See, e.g.*, *Williams v. United Cmty. Bank*, 218 N.C. App. 361 (2012) (holding there is no "separate claim for civil conspiracy in North Carolina.  Instead, civil conspiracy is premised on the underlying act. Where this Court has [dismissed] the defendants on the underlying tort claims . . . we have held that a plaintiff's claim for civil conspiracy must also fail.").

After dismissing all of Capps' underlying tort claims, the district court properly dismissed the civil conspiracy claim.  (J.A. 160.)  *See, e.g.*, *Loray Master Tenant, LLC. v. Foss N.C. Mill Credit 2014 Fund I, LLC*, 2021 WL 661910, at *9 (N.C. Super. Feb. 18, 2021) ("[W]hen all underlying tort claims against a party are dismissed, the civil conspiracy claim against that party likewise fails.").

Capps argues that even if the tort claims against Appellees were correctly dismissed, Newmark still had imputed liability for any acts furthering "the conspiracy." Even if true, the dismissal is harmless error. It is axiomatic that, "in North Carolina, there is no independent cause of action for civil conspiracy; the claim can arise only where there is an underlying claim for unlawful conduct." *Superior Performers, Inc. v. Meake*, 2014 WL 5819826, at *10 (M.D.N.C. Nov. 10, 2014) (quoting *Byrd v. Hopson*, 265 F.Supp.2d 594, 599 (W.D.N.C. 2003)); *see also Piraino Bros., LLC v. Atlantic Fin. Grp., Inc.*, 712 S.E.2d 328, 333 (N.C. Ct. App. 2011) (explaining that because the underlying tort claim was dismissed, the trial court was correct to dismiss the ancillary civil conspiracy claim). Although the Complaint initially included tort claims against co-defendant Monty Harris, those claims were withdrawn by Capps and dismissed with prejudice in connection with Capps' settlement with Harris. (J.A. 216.) Regardless of the court's decision to dismiss the conspiracy claim at the pleadings stage, the court ultimately would have dismissed the claim pre-trial after the remaining tort claims against Harris were dismissed.

Capps acknowledged that the conspiracy claim was no longer viable through his filings after stipulating to the dismissal of the tort claims against Harris. Almost four months after filing the stipulation of dismissal, and post-discovery, Capps sought leave to amend the complaint and reinstate claims for breach of the implied

covenant and tortious interference with prospective business relations against Newmark. (J.A. 219-290.) Had Capps believed, as he now claims, that the conspiracy claim was wrongfully dismissed at the pleadings stage, he should have requested the court reconsider its order and reinstate this claim. Capps cannot do so at this belated juncture.

## VI. The District Court Correctly Dismissed the Unfair Business Practices Claim

Chapter 75 of the North Carolina Unfair and Deceptive Trade Practice Act (the "UDTPA") prohibits "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. As used in the UDTPA, "business activities" refers to "the manner in which businesses conduct their regular day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 493 (N.C. Ct. App. 1991). "Although this statutory definition of commerce is expansive, the [UDTPA] is not intended to apply to all wrongs in a business setting. For instance, it does not cover employer-employee relations." *Id.* at 593 (internal citations omitted). The trial court found that Capps' claims of unfair and deceptive acts were not in commerce within the meaning of the UDTPA because the facts alleged "demonstrate the controversy in this case to be an employment dispute internal to Newmark." (J.A. 161.)

Although Capps admits in his brief that "CTG operated as a line of business within Newmark," and that Capps and Katz "jointly managed" CTG, he argues that Newmark interrupted the relationship between "different market participants." (*See* Capps Br. at 64.) Under Capps' misguided interpretation, he, Katz, and even their partnership are all different market participants. Such an expansive interpretation is incorrect.

A UDTPA claim can arise from an employment relationship only in rare circumstances. *Sara Lee Corp. v. Carter*, 351 N.C. 27 (1999). In *Sara Lee*, the court found that defendant, who was employed by plaintiff, was liable for claims under the UDTPA because defendant's conduct affected commerce when he forced his employer to purchase computer parts and services at above market prices from a separate business he controlled. *Sara Lee*, 351 N.C. at 33-34. The court, explaining that "defendant and plaintiff clearly engaged in buyer-seller relations in a business setting," held that "defendant's fraudulent actions fall within the ambit of the statutory prohibition of unfair and deceptive acts," and that his "mere employee status at the time he committed these acts does not safeguard him from liability[.]" *Id.* There are no such facts in the record of this case.

Capps' allegations are more akin to *White v. Thompson*, 691 S.E.2d 676, 680 (N.C. Ct. App. 2010). In *White*, the parties were partners in an entity known as Ace Fabrication and Welding. *White*, 691 S.E.2d at 677. After disputes erupted among

the partners over how work and proceeds from new contracts were allocated, the partners ended their partnership, and plaintiffs filed suit. *Id.* at 677-78. The North Carolina Supreme Court explained that the alleged conduct did not fall within the scope of the UDTPA because defendant's "conduct occurred completely with the ACE partnership and entirely outside the purview of this act." *Id.* at 680.

Despite Capps' claims to the contrary, the unfair and deceptive acts alleged pertain to the internal operations of Newmark's business:

> (i) unfairly denying Capps real estate commissions to which Capps is entitled; (ii) unfairly and deceptively diverting the CTG business to Katz and Harris, and depriving Capps of the benefit of his agreement with Newmark; (iii) unfairly depriving Capps of a fair opportunity to demand that his commissions be paid; (iv) terminating Capps' employment under the false pretext of a 'for cause' termination when there was no cause for terminating Capps' employment, and without giving Capps an opportunity to cure any alleged cause.

(J.A. 77 at ¶ 163.)

The district court did not err as a matter of law in dismissing Capps' UDPTA claim and that ruling should be affirmed.

## THIS COURT SHOULD DENY CAPPS' REQUEST FOR REASSIGNMENT

This Court should deny Capps' request that this matter be reassigned. Under Fourth Circuit case law, "The court has the power under 28 U.S.C. § 2106 to disqualify a district judge, but will do so only in extreme circumstances." *Glocker v. W.R. Grace & Co.*, 68 F.3d 460, at *3 (4th Cir. 1995). In deciding whether a case should be reassigned on remand, this Court evaluates: (1) whether the original judge

could reasonably be expected upon remand to have substantial difficulty in putting out of his mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. *Id.*; *see also United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 728-29 (4th Cir. 2021). This Court has noted that "reassignment to a different district judge is appropriate in the rare circumstance when, both for the judge's sake and the appearance of justice, reassignment furthers the public interest by minimizing even a suspicion of partiality." *Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 130 (4th Cir. 2019) (granting request for reassignment after district judge stated he had no intention of managing a trial with respect to the claims at issue and that the parties were "not going to enjoy being in this case").

Capps relies on a Seventh Circuit rule, which notably is the *only* circuit to require reassignment of a civil case after a bench trial. Reassignment is not required by the local rules of the District Court for the Eastern District of North Carolina. Capps argues this case should be reassigned because human nature dictates that Judge Flanagan *may* have a difficult time putting out of her mind previously expressed findings. Such is not the standard and must be ignored. Instead, when

there is no actual accusation of bias, "reassignment is appropriate in unusual circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *Steves & Sons*, 988 F.3d at 728 (quoting *United States v. North Carolina*, 180 F.3d 574, 582-83 (4th Cir. 1999)). Capps has not made such a showing and his request for reassignment should be denied.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ David A. Paul*
David A. Paul
CANTOR FITZGERALD SECURITIES
110 East 59th Street
7th Floor
New York, NY 10022
(212) 610-2298

Jonathan D. Sasser
Thomas H. Segars
ELLIS & WINTERS, LLP
4131 Parklake Avenue
P. O. Box 33550
Raleigh, NC 27636
(919) 865-7002

*Counsel for Appellees*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains <u>12, 985</u> words.

2.  This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated: August 23, 2021    Respectfully Submitted,

            */s/ David A. Paul*
            David A. Paul
            CANTOR FITZGERALD SECURITIES
            110 East 59th Street
            7th Floor
            New York, NY 10022
            (212) 610-2298

            Jonathan D. Sasser
            Thomas H. Segars
            ELLIS & WINTERS, LLP
            4131 Parklake Avenue
            P. O. Box 33550
            Raleigh, NC 27636
            (919) 865-7002

            *Counsel for Appellees*